RENDERED: SEPTEMBER 24 2020
TO BE PUBLISHED

𝕾upreme 𝕮ourt of 𝕶entucky

2018-SC-0560-MR

IMOJEAN DANIEL                                                    APPELLANT

V.
ON APPEAL FROM BREATHITT CIRCUIT COURT
HONORABLE FRANK ALLEN FLETCHER, JUDGE
NO. 17-CR-00098

COMMONWEALTH OF KENTUCKY                                          APPELLEE

## OPINION OF THE COURT BY JUSTICE LAMBERT

## REVERSING AND REMANDING

Imojean Daniel was convicted of murder in relation to the shooting death of her friend and roommate, Joy Turner. She now appeals her resulting thirty-year sentence. After review, we reverse and remand for a new trial consistent with this opinion.

### FACTUAL BACKGROUND

In the months leading up to her death in September 2016, forty-two-year-old Joy Turner's life was turbulent. Her beloved Aunt Eva, whom Joy considered to be a second mother, had recently passed away. Then, in January 2016, Joy's parents, Michael and Carolyn Turner, forced Joy to leave their home. Their decision to do so was a result of Joy's lifestyle choices, in particular her abuse of prescription medications.

1

After Joy left her parents' home, she was homeless. From January 2016 until late March or early April of 2016 Joy stayed with her then-boyfriend Bobby "B.J." Thomas, Jr. B.J. told investigating officers that while Joy lived with him she cried a lot, slept a lot, and stayed in the bedroom most of the time. He believed she was depressed due to her Aunt Eva's passing. Joy was being treated for anxiety and depression, and her medical records demonstrated she visited her treating physician frequently.

In April 2016 Joy moved out of B.J.'s home and began living with the Appellant, Imojean Daniel. Joy and Daniel were described by witnesses as best friends, and both of Joy's parents testified that they have known Daniel since she was a little girl. When Joy moved into Daniel's single-wide trailer, Daniel and her girlfriend Kim Spicer were already living there. Kim testified that she and Daniel have been romantically involved "on and off" for twenty-two years, and that they lived together for about eighty percent of that time. Kim said that she and Joy got along most of the time, but when Joy took too much of her prescription pills, she would "get mouthy" and Kim would leave the trailer to avoid altercations with her. Kim further stated that she never saw Daniel and Joy argue or fight.

Beverly Gross, who was very close to Daniel and Kim but did not know Joy, was a frequent visitor at the trailer. Beverly said that in the two months leading up to Joy's death, she visited the trailer at least three to four times a

2

week. Beverly was very candid about the fact that she, Daniel, Joy, and Kim all abused drugs[1] at the trailer. Beverly said that two weeks before Joy's death Daniel made Kim move out. It was Beverly's understanding that Daniel broke up with Kim and wanted to pursue Joy romantically. Beverly did not believe Joy was romantically interested in Daniel or that Daniel and Joy were in a relationship, but that Joy continued living with Daniel because she needed a place to stay. Kim stated that she only knew of Daniel and Joy being best friends and that they were never romantically involved.

The night of September 1, 2016, Daniel and Joy were at the trailer by themselves. Daniel would later tell lead detective Jeff Browning that she and Joy had been drinking and doing drugs that night at a friend's house, and they returned to the trailer sometime after 10 p.m. Joy was passing out, so Joy went to bed and Daniel went to the living room to watch a movie. The living room and the bedroom were separated by a kitchen area and a short hallway. Daniel told Det. Browning that at some point she walked down the hallway towards the bedroom. She saw Joy on the floor against the back wall of the room between the bed and an old pedal sewing machine. Daniel said she thought Joy fell out of bed and hit her head on the sewing machine until she tried to move her and saw the gun. Daniel said she pulled Joy away from the wall, laid her on her back, and attempted CPR. Daniel told Det. Browning that she never heard the gun, a .25 caliber semi-automatic pistol, go off.

---

[1] Beverly specifically mentioned Suboxone, Percocet and, Methadone. Beverly also acknowledged that she was using drugs intravenously during this time period.

Daniel's aunt, Gertrude Cole, lived next to Daniel; their homes were on either side of a small driveway. Sometime around midnight Gertrude's grandson,[2] Dalton Turner, and his friend Tyler Noble were sitting outside on Gertrude's porch. Both Dalton and Tyler testified to suddenly hearing Daniel screaming hysterically for someone to call 911 and seeing her banging on the side of her trailer with her hand. Prior to this, neither of them heard any arguing or screaming from within Daniel's trailer, and neither of them heard a gunshot. One of Daniel's neighbors called 911, and police arrived on the scene soon after. Joy's mother, father, and sister were also called to the scene that night. Daniel was not arrested that day, as the investigating officers did not feel they had enough evidence to disprove Joy killed herself.

Although Daniel's version of events remained consistent in her statements to police, other witnesses claimed that her version of events as told to them differed. Joy's mother and father and Beverly all testified that Daniel said she and Joy were in the bedroom and Joy asked Daniel to get her a pop from the kitchen. And, when Daniel went back to the bedroom, she saw Joy slumped on the floor between the bed and the sewing machine. In addition, Joy's father testified that he heard Daniel say she was asleep and did not hear the gun go off. Finally, Deputy Jailer Nelda Fugate testified that she transported Daniel shortly after her eventual arrest a year later in November 2017. Jailer Fugate said she told Daniel that she was charged with murder, to which Daniel replied, "it wasn't murder, it was assisted suicide."

---

[2] Daniel's cousin.

Dr. Laura Lippincott, the medical examiner and forensic pathologist that conducted Joy's autopsy, testified for the Commonwealth. She determined that the bullet entered Joy's skull through her right parietal scalp. In layman's terms, "above the ear and a bit behind it, but not the back of the head." The bullet then traveled "back to front, right to left, and slightly downward," and never exited Joy's skull. Further, Dr. Lippincott determined based on the soot around the wound that it was a contact wound. This meant that the gun was pressed against Joy's head when it was fired.

Dr. Lippincott also noted that several different substances were found in Joy's blood: Clonazepam, Tetrahydrocannabinol, Oxycodone, Gabapentin, and alcohol. All of the substances were present at therapeutic levels, except for the alcohol, the percentage of which Dr. Lippincott could not compare to a blood alcohol content level. She testified that, in her opinion, these substances would have had an "interactive effect" upon Joy.

When Dr. Lippincott initially completed Joy's autopsy, she ruled her manner of death to be homicide. However, when she later reviewed the case, she changed her opinion. She testified that she could no longer rule out suicide or homicide as Joy's cause of death.

David McCann, a Forensic Scientist Specialist II with the Kentucky State Police's Central Forensic Lab, testified for the defense. He tested swabs collected by investigating officers at the scene for DNA, and tested them against DNA samples collected from Joy, Kim, and Daniel. Of particular note, the swab from the trigger of the gun contained Joy's DNA, but Daniel and Kim were

5

conclusively ruled out as contributors to the DNA profile. The DNA profile from a swab of the grip of the gun was too limited for meaningful interpretation.

Additional facts are discussed below as necessary.

## I. ANALYSIS

Daniel asserts a myriad of alleged errors on appeal. First, that the trial court erred by allowing three separate pieces of testimonial evidence to be admitted in violation of KRE[3] 404(b), one of which lacked sufficient pre-trial notice under KRE 404(c). Second, that the trial court violated her due process right to present a defense when it denied her request for expert funds, and that the Commonwealth made a prejudicial statement in its closing in relation to the denial of funds. Third, that the trial court erred by allowing a Styrofoam head used by the medical examiner during her testimony to be admitted into evidence. Fourth, that the trial court failed to instruct the jury on both the Commonwealth's burden of proof and extreme emotional disturbance. Finally, that the trial court erred by denying Daniel's request to suppress her statement to Jailer Fugate.

### A. KRE 404(b) Evidence

Daniel's first argument on appeal is that the trial court erred by admitting three separate items of evidence regarding Daniel's other bad acts into evidence in violation of KRE 404(b). She further asserts that one of those pieces of evidence lacked the requisite pre-trial notice from the Commonwealth in violation of KRE 404(c). We will address each piece of evidence in turn.

---

[3] Kentucky Rule of Evidence.

*(i.)  Shooting into the Air Incident*

Beverly testified that in all the time she spent at Daniel's trailer, she never saw Daniel and Joy get into a physical altercation. She acknowledged that they occasionally fought, but that their fights only involved screaming at each other. The worst fight she ever witnessed happened about a week before Joy's death. Daniel had misplaced $7 and accused Joy of having it. Joy denied having the money, and the argument escalated. Daniel got her pistol, walked outside onto the porch, and fired the pistol into the air several times.

Daniel argues that this evidence was admitted in error both because the Commonwealth did not provide adequate notice of its intention to introduce it in accordance with KRE 404(c),[4] and because it constitutes other bad acts evidence which is not otherwise admissible under KRE 404(b). This alleged error was properly preserved for our review by Daniel's objection to the evidence on both KRE 404(c) and KRE 404(b) grounds.[5]

On the morning of the first day of trial, during a colloquy on the matter the Commonwealth acknowledged the testimony it anticipated eliciting from Beverly as recounted above regarding the shooting into the air incident. The Commonwealth argued first, that the evidence was not KRE 404(b) evidence, and it was therefore not required to disclose is intention to use it. Further, it asserted that the information was contained in Beverly's statement to police and the defense therefore had adequate notice of its intent to introduce it. The

---

[4] "In a criminal case, if the prosecution intends to introduce evidence pursuant to subdivision (b) of this rule as a part of its case in chief, it shall give reasonable pretrial notice to the defendant of its intention to offer such evidence." KRE 404(c).

[5] Kentucky Rule of Criminal Procedure (RCr) 9.22.

trial court ruled that the evidence was admissible because Beverly's statement to police was included in the discovery materials provided to the defense by the Commonwealth. Later, after *voir dire* but before the jury was sworn, the trial court and the parties had a discussion in chambers and the trial court again found that the Commonwealth provided adequate notice of its intent to use Beverly's statement in its case-in-chief.

Because we are reversing Daniel's conviction and remanding for a new trial on other grounds, we decline to address whether this evidence is otherwise admissible under KRE 404(b). We instead leave that determination to the sound discretion of the trial court on remand. But we remind the trial court that, as with any evidence, it must conduct the requisite balancing test under *Bell v. Commonwealth*[6] before ruling on the admissibility of this evidence. Specifically, it must find that the evidence is relevant, and that its probative value is not substantially outweighed by its potential prejudicial effect.[7]

As for the potential lack of KRE 404(c) notice,[8] on remand the issue of pre-trial notice will be mooted by virtue of the defense's actual notice of the Commonwealth's use of the evidence in its case-in-chief during the first trial.

*(ii.) Two Dollar Bill Evidence*

Cody Abner testified that he owned a small convenience store in the community, and that he knew Joy, her parents, Daniel, and Kim. He stated

---

[6] 875 S.W.2d 882 (Ky. 1994).

[7] *Id.* at 889.

[8] *See Daniel v. Commonwealth,* 905 S.W.2d 76, 77 (Ky. 1995) (holding "A police report alone does not provide reasonable pretrial notice pursuant to KRE 404(c).").

that about a week after Joy's death, Daniel and Kim came to his store together and bought some items. They both exited the store. Then, Kim came back in by herself to buy something else and paid with a $2 bill. Cody said customers rarely pay with $2 bills, so he was looking at it and noticed Joy's name on it. He immediately informed her family.

Carol, Joy's mother, identified the $2 bill as Joy's and testified regarding the significance of the $2 bill to Joy. She said that when Joy was a senior in high school, she and two of her friends had a kind of senior skip day, and they all signed their names and nicknames and the date, June 3, 1992, on the $2 bill. Carol said Joy had carried the bill behind her ID in her wallet ever since. Carol said Joy would have "walked in the desert" before spending it. The bill was also identified by Joy's sister.

Daniel argues that the trial court abused its discretion in allowing this evidence because it is not relevant, and it is other bad act evidence not otherwise admissible under KRE 404(b). This alleged error was preserved for our review by her contemporaneous objection to the evidence.[9] We review a trial court's ruling on the admission of evidence for abuse of discretion.[10] A trial court abuses its discretion when it rules in a way that is arbitrary, unreasonable, unfair, or unsupported by sound legal principles.[11]

As we have already mentioned, to be admissible every piece of evidence must first satisfy the *Bell* test. That is, the evidence must be relevant, and its

---

[9] RCr 9.22.

[10] *Holt,* 250 S.W.3d at 652.

[11] *English,* 993 S.W.2d at 945.

9

probative value must not be substantially outweighed by its potential prejudicial effect.[12]

To begin, we struggle to see what probative value, and by extension what relevance this evidence has. Cody testified that Daniel and Kim initially came into his store together, purchased items, and then left. Then, Kim returned *without Daniel* and purchased something with Joy's $2 bill. Kim was not on trial for Joy's murder, Daniel was. So the contention that this evidence could somehow demonstrate Daniel's motive to murder Joy is tenuous, at best. Of course, one could speculate that Daniel gave Kim the $2 bill to spend, but there was absolutely no evidence to suggest this was the case. Further, the evidence showed that Joy's belongings remained in Daniel's home for three weeks following her death, and that Kim was in Daniel's home following Joy's death. It is therefore possible that Kim came across the $2 bill and took it without Daniel's knowledge. Accordingly, this evidence has very little probative value, if any.

On the other hand, this evidence's potential prejudicial effect was great. Presenting this evidence to the jury suggested that Daniel was somehow responsible for the $2 bill being spent, and, therefore, that Daniel was motivated to kill Joy for her belongings.

The trial court abused its discretion by allowing it into evidence without proof of Daniel's direct misappropriation of the sentimentally significant $2 bill.

*(iii.) Jewelry Evidence*

---

[12] *Bell*, 875 S.W.2d at 889.

Beverly testified that about a week after Joy died, she went to Daniel's trailer with her daughter. Daniel was going through a box of Joy's jewelry, and Daniel gave some of the costume jewelry to Beverly's daughter. Daniel asked Beverly if she wanted any of the jewelry, but Beverly declined. Beverly said that when she got home, she threw away the jewelry Daniel gave to her daughter. She further claimed that Daniel and Kim took the real silver and gold jewelry and pawned it. Beverly identified the pawn shop at which Daniel and Kim allegedly pawned the jewelry. Beverly was the only witness that testified to this, and there was no other evidence that the jewelry was pawned, such as a pawn receipt.

Daniel argues that this evidence was improperly admitted in violation of KRE 404(b). While this alleged error was properly preserved for our review, we decline to address it on the merits due to our reversal on other grounds. Instead, we leave the determination of whether it is admissible to the discretion of the trial court on remand. We reiterate that the trial court must conduct a balancing test under *Bell* before ruling on its admissibility.

**B. Expert Funds**

Daniel next asserts that the trial court committed reversible error when it denied her motion for expert funds under KRS[13] 31.110(1)(b) and KRS 31.185(1). This issue was properly preserved for our review by Daniel's pre-trial, *ex parte* motion for expert funds and subsequent objections to the trial

---

[13] Kentucky Revised Statute.

11

court's adverse rulings on the issue.[14] This Court reviews a trial court's denial

of a defendant's motion for expert funds for abuse of discretion.[15] A trial court

abuses its discretion when it rules in a way that is arbitrary, unreasonable,

unfair, or unsupported by sound legal principles.[16]

Because of the fundamental principle that a defendant's indigence[17]

should not serve to deprive her of her due process right to present a defense,

KRS 31.110(1) provides that a needy person who is charged with a serious

crime is entitled

> (a) To be represented by an attorney to the same extent
> as a person having his or her own counsel is so
> entitled; and

> (b) [To] be provided with the necessary services and
> facilities of representation, **including investigation
> and other preparation**. The courts in which the
> defendant is tried shall waive all costs.[18]

In addition, KRS 31.185(1) directs that

> [a]ny defending attorney operating under the
> provisions of this chapter is entitled to use the same
> state facilities for the evaluation of evidence as are
> available to the attorney representing the
> Commonwealth. If he or she considers their use
> impractical, the court of competent jurisdiction in
> which the case is pending may authorize the use of
> private facilities to be paid for on court order from the
> special account of the Finance and Administration
> Cabinet.

---

[14] RCr 9.22.

[15] *McKinney v. Commonwealth*, 60 S.W.3d 499, 505 (Ky. 2001).

[16] *English*, 993 S.W.2d at 945.

[17] Daniel's indigent status is not contested by the Commonwealth.

[18] (Emphasis added).

Several decades of case law in this area have distilled the test for whether a defendant made a sufficient showing of need for expert funds into the following: "1) whether the request has been pleaded with requisite specificity; and 2) whether funding for the particularized assistance is 'reasonably necessary'; 3) while weighing relevant due process considerations."[19] Further, "our review of a trial court's denial of funds pursuant to KRS 31.110 is limited to the reasons actually presented to the trial court."[20]

At the outset, we reiterate that the *only* issue the jury had to decide in this case was whether Joy died as the result of homicide or suicide. On June 20, 2018, the defense filed an *ex parte* motion for expert funds. Specifically, the defense requested funds to hire a crime scene reconstructionist to help the defense review the Commonwealth's evidence against Daniel, to conduct additional testing and analysis of that evidence, to provide expert testimony at trial, and to aid the defense in cross-examining and impeaching the Commonwealth's witnesses regarding that evidence. The defense argued the following as grounds for the trial court to grant said funds:

> Imojean Daniel is charged in this indictment with Murder, a Capital Offense. The case involves an accusation that Imojean Daniel killed Joy Turner by shooting her in the head. The case was initially investigated as a suicide however; Ms. Daniel was subsequently indicted for murder. There is significant evidence that Ms. Turner was depressed and suicidal at the time leading up to her death. In addition, the evidence collected and some not collected by the Kentucky State Police indicate that suicide cannot be ruled out. Ms. Daniel is facing the potential of life in

---

[19] *Benjamin v. Commonwealth*, 266 S.W.3d 775, 789 (Ky. 2008)

[20] *McKinney*, 60 S.W.3d at 505.

13

prison therefore; she must be afforded this expert assistance.

The defense further identified Shelly Rice as the reconstructionist that it intended to retain along with Ms. Rice's anticipated fees.

The trial court subsequently entered an order denying the defense's motion. The court cited solely to *Davenport v. Commonwealth*,[21] to be discussed *infra*, and found that the defense's goals in requesting expert funding could be satisfied solely by cross-examination of the Commonwealth's witnesses.

On June 22, the defense tendered a written motion for reconsideration and was heard on the matter during an *ex parte* hearing on the same day. The written motion, in addition to the reasons articulated in the defense's first motion, stated:

> Even the Medical Examiner, when interviewed by defense counsel, indicated that she would need to know more information to completely rule out suicide...Defense counsel needs the assistance of an expert to examine the scene, provide information about what proper investigation techniques were used and what proper techniques were not used. Very little evidence from the scene was collected by the Kentucky State Police. An expert in this field can provide defense counsel the information that is needed to conduct a proper cross-examination into what should have been done to definitely decide whether a homicide or a suicide took place that evening. To adequately and ethically represent Ms. Daniel, Defense counsel needs access to the funds to hire a crime scene Reconstructionist.

---

[21]  177 S.W.3d 763 (Ky. 2005).

14

During the hearing on the motion counsel argued verbally to the court that the court's reliance on *Davenport* in denying its first motion was misplaced because

> the *Davenport* case says that the reason [the defense] did not get the expert funds for the reconstructionist is that all they were trying to do is combat, in the investigation, what was done and was not done right. And [the court] said that could be brought out in cross. The issue that we have here is we're needing this reconstructionist for a specific purpose. Our theory of the case, as you just stated, has always been that Joy Turner [completed] suicide. And, granted that it is our position that the Kentucky State Police did not do their job correctly with the investigation, in order to prove our theory of the suicide it's going to come down to having an expert to show that with the position of the body, with the blood splatter that was in the photos that we were given by KSP,[22] that our theory is plausible and correct. So I think the difference between this one and *Davenport* is we're not just trying to say, 'well this is all the things that KSP did wrong.' We're trying to prove our theory.

The trial court denied the motion to reconsider and suggested the defense talk to the Medical Examiner regarding her conclusions and what they were based on. Defense counsel tried to explain that her conversations with the Medical Examiner were the very reason she determined a reconstructionist was needed; because the Medical Examiner told her that, without more information, she could not rule out suicide. The trial court cut the defense's explanation short and told her those were things that could be argued to the jury.

---

[22] Kentucky State Police.

15

While both the initial motion and motion to reconsider indicate that Ms. Rice's *curriculum vitae* was filed with them, a sworn affidavit from Ms. Rice was not filed until August 17th.

Ms. Rice's affidavit stated the following:

> 5. My preliminary review and opinion is this incident exhibits characteristics of an equivocal death scene. Equivocal death scenes are those that have questionable traits of the manner of death.

> 6. Equivocal death scenes require careful investigation and reconstruction techniques to determine the final conclusion of suicide or homicide. In my training, these types of deaths, specifically shooting incidents, are extensively covered in crime scene reconstruction, shooting reconstruction, and homicide investigation due to the sensitivity of such cases.

> 7. Upon more careful review and reconstruction of this case, I could offer further opinions of whether Ms. Turner was capable of committing suicide and if the scene is more consistent with this manner of death.

> 8. Based on the physical evidence in the photographs and other discovery materials, there are lingering questions as to the manner of death in which the fairness of a trial should be brought forth.

Ms. Rice's *curriculum vitae* reflected her extensive training in various areas of crime scene investigation and reconstruction.

On August 27, the first day of trial, after *voir dire* but before the jury was sworn, the trial court had an *ex parte* discussion with the defense. The court said it had since put additional thought into the defense's motion, and it still believed the defense could create reasonable doubt through cross-examination. The defense responded that it did not believe this to be a case where cross-examination would be enough. Their theory of the case was that Joy's death

16

was the result of suicide, and that the police's investigation into the case was insufficient to prove that she was murdered. The defense attorneys pointed out that they are not experts in crime scene investigation, and therefore having access to such an expert was crucial to the preparation and presentation of their case.

Indeed, during Det. Browning's cross-examination, the defense asked Det. Browning if he did any blood enhancement testing at the scene. Det. Browning said he did not, and that he did not know what blood enhancement testing, specifically Luminol,[23] was. He further said that he had never heard of using blood enhancement techniques to determine the origin from which a shot was fired.

After Det. Browning's testimony, the defense told the trial court that his testimony was precisely why they needed expert funds. The trial court asked if there was a learned treatise they could have consulted and cross-examined him with. The defense pointed out that learned treatises can only come in through a qualified expert, and Det. Browning would not even acknowledge that such testing existed and therefore could not be qualified as an expert. The Commonwealth acknowledged that it would have objected if the defense had tried to cross-examine him with a learned treatise. Later, during the Commonwealth's closing arguments, it used Det. Browning's testimony against the defense by stating:

> and then, [defense] counsel asked Detective
> Browning...a question about some kind of a blood

---

[23] Luminol is a chemical reagent used to test for the presumptive presence of blood. *See* 82 A.L.R.5th 67 (Originally published in 2000).

17

enhancement test to show where a shot was fired from. Det. Browning had never even heard of that. State police don't use that, and I very facetiously asked him if the state police were holding that back from him, of course they weren't. That might sound good on these TV programs, maybe, CSI or something. But in the real world they're not aware of any kind of tests like that. And I submit to you ladies and gentlemen that if there were a test like that, the defense would be coming in to show how terrible an officer he is because he didn't know about the test.

The defense objected to this. It argued that it tried to show that such tests actually exist through their own expert, but their motion was denied. The trial court said that it did not want to get into the merits of that argument and allowed the Commonwealth to continue.

As previously mentioned, our analysis of this issue must focus on whether the defense's claim was pleaded with requisite specificity, and whether the funding was reasonably necessary, while considering relevant due process considerations.

To begin, the trial court based its denial of the defense's motion for funding solely on *Davenport*, but we agree with the defense's position that ~~ease~~ *Davenport* is distinguishable from the case now before us. Davenport was convicted of the murder and robbery of Patrick Perkins.[24] One of Perkins' friends discovered his body in his home, which was "in disarray, with blood on the wall and furniture overturned."[25] Perkins' pants pockets were turned out,

---

[24] *Davenport*, 177 S.W.3d at 766.
[25] *Id.*

18

and one of his pistols was missing.[26] He was shot four times, and had

defensive wounds on his arms and wrists.[27]

Davenport's nephew testified that he drove Davenport to Perkins' home

on the night he was killed.[28] Shortly after Davenport entered the home his

nephew saw him "bounce off the front door," and heard a male voice that was

not his uncle's cry "please, don't kill me."[29] Scared, Davenport's nephew drove

away, leaving Davenport at Perkins' home.[30] Davenport later instructed his

nephew to deny leaving him at Perkins' home that night.[31] Davenport

ultimately admitted being in Perkins' home on the night he was killed, but

denied shooting him.[32]

On appeal to this Court, Davenport argued that the trial court

reversibly erred by denying his motion for funds to hire a crime scene expert.[33]

The sole basis for Davenport's motion was that "the investigation into [the

victim's] death was insufficient and was not conducted pursuant to commonly

accepted standards."[34] In support, the defense pointed to several steps the

investigating officers failed to take: "Perkins' core temperature was not taken to

determine the specific time of death, no effort was made to determine the

---

[26] *Id.*

[27] *Id.*

[28] *Id.* at 767.

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *Id.* at 766-67

[33] *Id.* at 773.

[34] *Id.*

owners of several weapons found in Perkins' home, and neither fingerprints nor blood samples were taken from Perkins' home."[35]

This Court held that the trial court properly denied Davenport's motion for expert funding, holding:

> [f]unds will not be provided pursuant to KRS 31.110 so that defense counsel may conduct a "fishing expedition." Rather, defense counsel must provide specific information that he or she expects the expert
>
> to provide at trial, and the request should be denied where defense counsel is only able to express the need for an expert in general terms. A "general" request is precisely the type made by Appellant in the present matter. Despite repeated requests by the trial court, defense counsel was unable to provide any specific reasons why an expert was needed, or any specific information an expert would be able to provide. Rather, defense counsel sought funds for an expert who would undermine the sufficiency of the investigation. We agree with the trial court that this purpose could be, and in fact was, reached by cross-examination of the investigating officers into what procedures were and were not taken in the investigation.[36]

Again, we believe *Davenport* is distinguishable from the case at bar. First, the victim in *Davenport* was unquestionably a victim of homicide, meaning that the only issue for the jury in that regard was the identity of the shooter. Here, Joy's manner of death was such a contestable issue that even the medical examiner could not determine whether Joy died as the result of homicide or suicide. Further, the evidence against Daniel was not quite as overwhelming as the evidence against Davenport. More importantly, Daniel

---

[35] *Id.*

[36] *Id.* (internal citations omitted).

20

was very specific about the expert she wanted and what she believed that expert could contribute to her defense. That is, to draw her own conclusions about whether Joy's death was consistent with a suicide—the most critical issue in the case—based on her expertise and to explain why the police's investigation into the case was insufficient to prove beyond a reasonable doubt that Joy died as a result of homicide. And, as the defense pointed out, their lack of expertise in what should have been done, or even what could have been done, put them at a great disadvantage.

We instead feel that this case more closely resembles one of the few cases in which this Court has ruled that a trial court erred by denying expert funds: *Sommers v. Commonwealth.*[37] Sommers was convicted of murdering two girls, a 12- and 13-year old, whose parents had abandoned them in the care of Sommers and his wife in the summer of 1988.[38] In December of 1988 the Sommers' house burned down, and the girls' bodies were found in the debris.[39] Forensic tests showed the girls did not die from smoke inhalation or the fire, but from suffocation prior to the fire.[40] The arson investigators determined the physical evidence was consistent with the fire being intentionally set.[41] The Commonwealth's theory at trial was that Sommers had been sexually abusing

---

[37] 843 S.W.2d 879 (Ky. 1992).

[38] *Id.* at 880.

[39] *Id.*

[40] *Id.*

[41] *Id.*

the girls, killed them to keep them from telling anyone, and then burned his house down to cover up the murders.[42]

This Court held that the trial court committed reversible error when it failed to grant Sommers' motion for funding for "a pathologist and an arson investigator to serve as consultants and/or witnesses for the defense."[43] After discussing *Hicks v. Commonwealth*,[44] *Smith v. Commonwealth*,[45] and *Simmons v. Commonwealth*,[46] cases in which the denial of expert funding was upheld on appeal, this Court concluded that Sommers' case was "vastly different."[47]

First, in Sommers' case, "both the cause of death and the genesis of the fire were matters of crucial dispute, resolvable only through circumstantial evidence and expert opinion."[48] Further, Sommers' counsel did not fail to demonstrate reasonable necessity:

> [i]n a memorandum in support of its motion, the
> defense pointed out that there were no eyewitnesses to

---

[42] *Id.*

[43] *Id.* at 883.

[44] 670 S.W.2d 837 (Ky. 1984) (holding defendant failed to demonstrate how a defense serologist could assist him, when sophisticated tests performed by a state crime lab serologist strongly indicated that blood at the crime scene was the defendant's blood).

[45] 734 S.W.2d 437 (Ky. 1987) (holding the defendant failed to demonstrate reasonable necessity for a ballistics or crime scene reconstruction expert when his stated purpose for those experts was to prove his mental state during the commission of his crimes).

[46] 746 S.W.2d 393 (Ky. 1988) (holding the defendant failed to demonstrate reasonable necessity for expert funds for two independent psychiatrists, two independent psychologists, and one licensed clinical social worker. Defendant was examined at the Kentucky Correctional Psychiatric Center by a psychiatrist and consulted with a social worker, both of whom testified on his behalf at trial. Defendant stated only in general terms that the requested expert assistance was needed to adequately prepare for trial).

[47] *Sommers*, 843 S.W.2d at 884.

[48] *Id.*

22

the alleged offenses, and the defendant denied committing either homicide or arson. It advised the court that there were material issues as to the cause of death and the nature and cause of the fire, and that experts from the medical examiner's office, the fire marshal's office and the Kentucky State Police were witnesses for the Commonwealth. It argued that different experts might observe the facts differently, or might reach different conclusions even given identical facts. Counsel maintained that without expert assistance he could not effectively investigate the circumstances, choose a course of defense, cross-examine the state's witnesses, or challenge the validity of their opinions.[49]

Accordingly, this Court held it was reversible error for the trial court to deny Sommers the requested funding.[50]

Again, in this case defense counsel was very specific about what it sought to gain through the use of a crime scene expert. It further identified the expert it wanted, the qualifications of that expert, a sworn affidavit from that expert,[51] and her anticipated fee. The issue upon which counsel sought expert assistance was the most crucial issue in that case: whether Joy died as the result of homicide or suicide. And, based upon the fact that the police's investigation was insufficient to convince the Medical Examiner of Joy's cause of death, there is reason to believe that expert assistance could have helped the defense explain why the investigation was insufficient to prove beyond a reasonable doubt that Joy was murdered.

---

[49] *Id.*

[50] *Id.* at 885.

[51] Although Ms. Rice's affidavit was filed relatively late in the game, it was still before the trial court to consider before the court made its final ruling on this matter on the first day of trial.

Accordingly, we hold that Daniel's motion for expert funds was pleaded with requisite specificity, and that it demonstrated reasonable necessity for the expert funds it sought. The trial court therefore abused its discretion in failing to grant Daniel's motion for expert funds. Accordingly, we reverse Daniel's conviction and remand for a new trial consistent with this opinion.

As a final note, we feel it is important to point out that the dissent's comparison of this case to *Commonwealth v. Ferguson*, 581 S.W.3d 1 (Ky. 2019), is incomplete and misleading. In *Ferguson*, the victim suffered two gunshot wounds to the head. *Id.* at 3. Further, the Medical Examiner in *Ferguson* believed that the victim's gunshot wounds were likely not self-inflicted due to the distance from the victim that one of the shots was fired. *Id.* at 15-16.

### C. Styrofoam Head

Daniel next asserts that the trial court committed reversible error when it allowed a Styrofoam head used by Dr. Lippincott for demonstrative purposes to be entered into evidence. This alleged error was properly preserved for our review by Daniel's contemporaneous objection to the Styrofoam head being admitted into evidence.[52] We review a trial court's ruling on the admission of evidence for abuse of discretion.[53] A trial court abuses its discretion when it rules in a way that is arbitrary, unreasonable, unfair, or unsupported by sound legal principles.[54]

---

[52] RCr 9.22.

[53] *Ross v. Commonwealth*, 455 S.W.3d 899, 910 (Ky. 2015).

[54] *English*, 993 S.W.2d at 945.

24

During Dr. Lippincott's testimony, she used a Styrofoam head to demonstrate both approximately where the entrance wound on Joy's head was and the general trajectory of the bullet after it entered her skull. She acknowledged that the Styrofoam head was not to scale, i.e., was not precisely the same size and shape of Joy's head. Dr. Lippincott used the measurements of Joy's wound contained in her autopsy notes to determine approximately where the entrance wound was, which she marked on the skull prior to her testimony. During her testimony she pushed a stick into the Styrofoam head to demonstrate the general trajectory of the bullet.

Daniel did not object to Dr. Lippincott's testimony or the use of the Styrofoam head as a visual aid. However, Daniel did object to the Styrofoam head being entered into evidence as an exhibit, asserting that it was only meant to be used for demonstrative purposes. The trial court overruled the objection on the grounds that the main issue for the jury to decide was whether Joy's death was the result of homicide or suicide and that trajectory is an important consideration in making that decision. Further, Dr. Lippincott is a forensic pathologist and is therefore a qualified expert to present that kind of evidence.

Daniel now argues to this Court, primarily under *Rankin v. Commonwealth*,[55] that the Commonwealth's use of the Styrofoam head was not a "fair comparison," and is therefore reversible error. Daniel contends that the Styrofoam head was highly prejudicial because it bolstered the

---

[55] 327 S.W.3d 492 (Ky. 2010).

25

Commonwealth's theory that Daniel shot Joy in the head. In addition, Daniel argues that the Styrofoam head was not probative of anything because it was not a scale model of Joy's head. However, this Court is inclined to agree with the Commonwealth's assertion that the Styrofoam head is more akin to the visual aid evidence approved of in *Stringer v. Commonwealth*,[56] than the experiment evidence of *Rankin*. But, at any rate, the evidence would still be admissible under a *Rankin* analysis.

At the outset we note that Daniel's assertion that this evidence bolstered the Commonwealth's theory of the case is simply incorrect. Dr. Lippincott never stated that the location of the entrance wound or the trajectory of the bullet was consistent with homicide. And, Dr. Lippincott later stated during cross-examination that she was unable to make a ruling on Joy's manner of death; she could rule out neither homicide nor suicide. That said, we will next address the parties' respective arguments under our existing case law.

*Stringer* was a child sex abuse case wherein we held that the trial court did not err by allowing the victim to use anatomically correct dolls while describing the acts Stringer perpetrated upon her.[57] We held simply that the child's "use of the dolls was no different than the employment by a witness of any other appropriate visual aid."[58]

---

[56] 956 S.W.2d 883 (Ky. 1997).

[57] *Id.* at 886.

[58] *Id.* at 887.

*Rankin*, in contrast, was slightly more complex. Rankin was convicted of first-degree criminal abuse and wanton murder.[59] Rankin was babysitting his girlfriend's children, 6-month-old C.A. and 2-year-old M.A., while his girlfriend was at work.[60] Rankin claimed that he put the children down for a nap, leaving C.A. in her car seat on the floor.[61] When he checked on the children approximately an hour later, "he found the car seat tipped over and C.A. on the floor with M.A. kneeling on her neck."[62] Tragically, C.A. was later pronounced dead.[63]

One of Rankin's arguments on appeal to this Court was that the trial court erred by allowing the Commonwealth to play a video made by a social worker involved in the case.[64] The video depicted M.A. "interacting with a sand-filled teddy bear weighted to approximate C.A.'s weight and placed in a car seat like C.A.'s on the floor of the social worker's interview room."[65] The video shows M.A. trying to lift the teddy bear from the car seat, and failing.[66] Rankin argued that the exhibit was prejudicially misleading because, though they had the same weight, the teddy bear and C.A.'s body differed in other respects and therefore the experiment could not provide a reliable

---

[59] *Rankin*, 327 S.W.3d at 494.

[60] *Id.* at 495.

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] *Id.* at 498.

[65] *Id.*

[66] *Id.*

comparison.[67] This Court disagreed with Rankin's argument and reasoned that

> the Commonwealth did not offer the social worker's video of M.A. as a simulation of what happened to C.A., but rather as proof tending to show that the two-year-old was not strong enough to lift his fourteen-pound sister out of her car seat, thus casting doubt on Rankin's statement to police that he found the children on the floor with M.A. kneeling on C.A.'s neck. **For this limited purpose, the weighted teddy bear was sufficiently like an infant to give the experiment some probative value**...In short, the
>
> experiment's obvious limitations can reasonably be deemed to go to its weight as evidence, not to its admissibility.[68]

Accordingly, although we feel the Styrofoam head is more comparable to the visual aid evidence in *Stringer* than the out-of-court experiment evidence in *Rankin*, we hold that it would be admissible through the lens of either case. Dr. Lippincott used the Styrofoam head as a visual aid to demonstrate the general area where the bullet entered Joy's skull, and the resultant bullet path and nothing more. Thus, it was an appropriate visual aid, and *Stringer* is not violated. Additionally, under a *Rankin* analysis, because Dr. Lippincott's testimony was clear that the Styrofoam head was not to scale and was meant only to be a demonstration of the *approximate* locations of the entrance wound and bullet path, the Styrofoam head was sufficiently similar to Joy's *for that limited purpose* to give it probative value. And, as previously discussed, the evidence was neutral on the issue of homicide versus suicide and therefore was

---

[67] *Id.*

[68] *Id.* (emphasis added).

not prejudicial. The trial court accordingly did not abuse its discretion in allowing this evidence.

## D. Jury Instructions

Daniel next asserts that the trial court committed two reversible errors in relation to the jury instructions given in this case. First, she asserts that the trial court erred by failing to give a stand-alone instruction on the Commonwealth's burden of proof. She also argues that the trial court erred by failing to instruct the jury on extreme emotional disturbance (EED). These alleged errors were properly preserved by Daniel's tender of instructions on the Commonwealth's burden of proof and EED, respectively.[69] We review a trial court's ruling regarding jury instructions for abuse of discretion.[70] A trial court abuses its discretion when it acts in a way that is arbitrary, unreasonable, unfair, or unsupported by sound legal principles.[71] With this in mind, we address each argument in turn.

*i.) Burden of Proof*

Daniel first contends that the trial court abused its discretion by declining to give a stand-alone instruction on the Commonwealth's burden of proof. Daniel tendered the following instruction on "Burden of Proof":

> The burden of proof in this case rests on the prosecution from the beginning to the end of trial to establish, beyond a reasonable doubt, every fact essential to the conviction of Imojean Daniel of a particular offense. Ms. Daniel has no burden to sustain. If upon the whole case, you have a

---

[69] RCr 9.54(2).

[70] *Ratliff v. Commonwealth*, 194 S.W.3d 258, 274 (Ky. 2006).

[71] *English*, 993 S.W.2d at 945.

29

reasonable doubt as to Ms. Daniel's guilt, you shall find her not guilty.

The trial court declined to give this instruction. It agreed with the Commonwealth that, because of the other instructions given, a stand-alone instruction on burden of proof was not necessary.[72] The instruction ultimately given to the jury on "Presumption of Innocence" provided:

> The law presumes Imojean Daniel to be innocent of a crime, and the indictment shall not be considered as evidence or as having any weight against her. You shall find Imojean Daniel not guilty unless you are satisfied from the evidence alone and beyond a reasonable doubt that she is guilty. If upon the whole case you have a reasonable doubt that she is guilty, you shall find her not guilty.

On appeal to this Court, Daniel seems to argue that without the stand-alone instruction on burden of proof she proposed, the jury would not know that Daniel never had a burden of proof. We disagree.

Instead, we believe the reasoning of the Court of Appeals in *Patterson v. Commonwealth* is applicable to this issue. *Patterson* held that

> [i]t is entirely unreasonable to believe that a juror, without benefit of a burden of proof instruction, could conclude other than that it is for the Commonwealth to bear this obligation. It is clearly evident through the presumptions of innocence and reasonable doubt instructions upon whom the burden lies without the need for a specific, separate instruction.[73]

---

[72] There is no video record of the conversation between the trial court and respective counsel regarding jury instructions. We instead refer to the narrative statement provided by the trial court.

[73] 630 S.W.2d 73, 75 (Ky. App. 1981). This holding has previously been cited favorably by this court. *See, e.g., Herp v. Commonwealth*, 491 S.W.3d 507, 513 (Ky. 2016); *Patterson v. Commonwealth*, 2005-SC-000831-MR, 2007 WL 541923, at *8 (Ky. Feb. 22, 2007); and *Cissell v. Commonwealth*, 2004-SC-0487-MR, 2006 WL 141613, at *7 (Ky. Jan. 19, 2006).

30

Here, in addition to the "Presumption of Innocence" instruction, the jury was informed by the defense once during its opening statement, and three times during its closing argument that the Commonwealth bore the burden of proof to prove beyond a reasonable doubt that Daniel killed Joy. The Commonwealth also acknowledged this during its opening statement. It is therefore untenable that the jury did not know that the Commonwealth bore the burden of proof absent Daniel's proposed instruction. The trial court did not abuse its discretion by declining to give that instruction to the jury.

*ii.) Extreme Emotional Disturbance*

Daniel next argues that the trial court abused its discretion in failing to instruct the jury on EED. Daniel's tendered murder instruction required the jury to find that Daniel was not acting under EED when she shot Joy. The trial court declined to give the instruction. It reasoned that the absence of EED was not an element the Commonwealth was required to prove, and Daniel had presented no evidence that she acted under EED. We agree with the trial court's ruling.

Trial courts have a duty to instruct the jury on the whole law of the case.[74] But that duty does not extend to placing speculative theories before the jury merely because the testimony includes some basis for the speculation.[75] A jury instruction on EED in particular "must be supported by some definite,

---

[74] RCr 9.54(1).

[75] *Lackey v. Commonwealth*, 468 S.W.3d 348, 355 (Ky. 2015).

non-speculative evidence."[76] The evidence must show that there was an identifiable triggering event[77] which caused the defendant to "suffer a temporary state of mind so enraged, inflamed, or disturbed as to overcome [the defendant's] judgment, and to cause [the defendant] to act uncontrollably from an impelling force of the extreme emotional disturbance rather than from evil or malicious purposes."[78]

Daniel contends that one of the motives the Commonwealth proposed was that Daniel was jealous of Joy. More specifically, that Daniel was interested in Joy romantically, and Joy did not feel the same way about her. Therefore, Daniel reasons, if the jury ultimately found that she shot Joy, it would have been reasonable for the jury to also conclude that there was a triggering event that night that caused the shooting. The Commonwealth itself presented no evidence of a triggering event, and Daniel's theory of the case from beginning to end was that Joy killed herself. Accordingly, the evidence was not sufficient to warrant an instruction on EED, and the trial court did not abuse its discretion in declining to give such instruction.

### E. Suppression of Daniel's Statement to Deputy Jailer Fugate

Daniel's final argument is that the trial court erred by failing to suppress the statement she made to Deputy Jailer Nelda Fugate. This alleged error was properly preserved by Daniel's pre-trial motion to suppress the statement, and

---

[76] *Padgett v. Commonwealth*, 312 S.W.3d 336, 341 (Ky. 2010) (internal quotation marks omitted).

[77] *Driver v. Commonwealth*, 361 S.W.3d 877, 888 (Ky. 2012).

[78] *Padgett*, 312 S.W.3d at 341.

subsequent contemporaneous objection to the testimony at trial.[79] Our review of a trial court's ruling on the suppression of evidence is a two-step process: "[w]e review the trial court's factual findings for clear error, and deem conclusive the trial court's factual findings if supported by substantial evidence. The trial court's application of the law to the facts we review de novo."[80]

As both parties agree about the facts surrounding this issue, we hold that the following facts are supported by substantial evidence and the first step of our review is therefore satisfied. Jailer Fugate testified during the suppression hearing that she had worked for the Breathitt County Fiscal Court for four years. Her primary duty was to transport female prisoners to and from jail, court, doctor's appointments, or wherever else they needed to go. When she transports a prisoner, she is required to fill out a "body receipt" to be signed by the person receiving the prisoner. The body receipt includes things like the date, time, and charges against the prisoner. Jailer Fugate said it is her practice to read to the person she is transporting the charges against them. This is not something required of her by her employer, but she began doing it because in her experience most people ask what they are charged with.

Jailer Fugate said she picked Daniel up from the Jackson Police Department after Daniel was arrested. Daniel seemed sober and not in need of any medical attention. Jailer Fugate then put Daniel in the back of her

---

[79] RCr 9.22.

[80] *Williams v. Commonwealth*, 364 S.W.3d 65, 68 (Ky. 2011).

transport vehicle. While they were still sitting in the parking lot of the Jackson Police Department, Jailer Fugate informed Daniel she was charged with murder. Daniel immediately replied that "it wasn't murder, it was assisted suicide." Fugate said that she believed what Daniel said was incriminating and she therefore did not say anything else to Daniel. As soon as she dropped Daniel off, she wrote down what Daniel said. KSP officers later came and interviewed her, and she told them what Daniel said. Based on this testimony, the defense argued that Daniel's statement should have been suppressed because Jailer Fugate did not read Daniel her *Miranda* rights[81] and Jailer Fugate knew or should have known that reading Daniel her charges would elicit an incriminating statement.

In its order denying Daniel's motion to suppress the statement, the trial court noted that the parties stipulated that Daniel was in custody and that Jailer Fugate was a state actor. Therefore, the only legal issue the trial court ruled on, and consequently the only issue for our review, was whether or not Jailer Fugate's statement to Daniel was an interrogation or its functional equivalent.[82] The trial court ultimately found that Daniel's statement was voluntary and was not the result of a custodial interrogation. It is this finding that we now review de novo.

"Interrogation" under *Miranda* and its progeny means both the colloquial understanding of the word, and its broader definition of "any words or actions

---

[81] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

[82] *See Smith v. Commonwealth*, 312 S.W.3d 353, 358 (Ky. 2010) (holding that *Miranda* warnings are only required when a person is in the custody of a state actor conducting an interrogation).

34

on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect...focus[ing] primarily upon the perceptions of the suspect, rather than the intent of the police."[83]

Here, it is clear that Jailer Fugate never asked Daniel any questions. Therefore, the issue becomes whether Jailer Fugate knew, or should have known, that informing Daniel that she was charged with murder was reasonably likely to elicit an incriminating response from her. We hold that, under the facts of this case, merely telling a prisoner what she was charged with was not an interrogation.

First, most people who are informed that they have been charged with a crime will do the exact opposite of saying something incriminating. They are likely to say something like "I didn't do anything" or, in this instance, "I didn't murder anyone."

Further, we have held in other cases that similar conduct to that of Jailer Fugate did not constitute an interrogation. For example, in *Taylor v. Commonwealth*, officers were holding Taylor in handcuffs and informed him that "he was not under arrest and that they had been told he possessed drugs."[84] Taylor voluntarily responded that he had illegal drugs in his pockets.[85] Taylor argued to this Court, as Daniel does now, that his

---

[83] *Wells v. Commonwealth*, 892 S.W.2d 299, 302 (Ky. 1995) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

[84] 182 S.W.3d 521, 522 (Ky. 2006).

[85] *Id.* at 522.

incriminating statement should have been suppressed because he was not read his *Miranda* rights prior to making it and the officers' statement to him was the functional equivalent of an interrogation.[86] This Court disagreed and held that "[t]elling an individual of the reason he is being stopped by police is not an interrogation."[87]

In another case, *Wells v. Commonwealth*, Wells entered the home of a man named Charlie Robinson, attempted to rob him, and stabbed him in the back.[88] Robinson was able to survive the attack long enough to call 911 and identify Wells as his attacker, but later died as a result of his injuries.[89] After Wells left Robinson's house he stole $500 in government food stamps from a bank.[90]

Wells was initially arrested for theft, but during his interview with police one of the officers "told the other officers that she would need additional time to complete paperwork on an expected additional murder charge and to inform the jail officials."[91] Wells became irate and demanded to know what she was talking about.[92] The officer explained that Wells would be charged with first-degree assault, which would be elevated to murder if the victim died.[93] Wells

---

[86] *Id.* at 523.

[87] *Id.* at 524.

[88] 892 S.W.2d 299, 300-01 (Ky. 1995).

[89] *Id.* at 301.

[90] *Id.*

[91] *Id.*

[92] *Id.*

[93] *Id.*

then asked if the officer was talking about "that thing on Iowa (street) with old Charlie (the victim)."[94] It was this statement that Wells argued should have been suppressed, as he believed it was the functional equivalent of an interrogation.[95]

This Court disagreed and held that the officer's statement to the other officers "cannot be considered the functional equivalent of questioning. Those statements may well be considered 'normally attendant to arrest and custody. Furthermore, such a statement does not evidence a functional equivalent to interrogation which would require suppression."[96]

While the facts of this case are not precisely on point with those in *Taylor* and *Wells*, the principles remain the same. First, there is a strong argument that, for Jailer Fugate, reading charges to a prisoner she is transporting is a statement "normally attendant to arrest and custody," as she testified that it is her practice to do so with every prisoner she transports. But even if that were not the case, we can discern no reason why Jailer Fugate knew, or should have known, that simply telling Daniel what she was charged with would have elicited such an incriminating response. Therefore, we hold that the statement was not an interrogation or its functional equivalent, and the trial court did not err in declining to suppress Daniel's statement.

## II. CONCLUSION

---

[94] *Id.*

[95] *Id.* at 302.

[96] *Id.* (internal citation omitted).

Based on the foregoing, we reverse and remand for a new trial consistent with this opinion.

Minton, C.J.; Hughes, Keller, Lambert, Nickell, VanMeter and Wright, J.J. sitting. Minton, C.J.; Hughes, Lambert, VanMeter and Wright concur.

KELLER, J., CONCURRING IN PART AND DISSENTING IN PART: Although I agree with much of the majority's opinion, I concur in result only regarding the evidence that Daniel shot her gun in the air during an argument with Joy. I respectfully dissent from its holdings regarding the evidence of the two-dollar bill and the denial of expert funds. Finally, I believe that the prosecutor's comments during closing argument regarding Daniel's lack of an expert, although not warranting reversal, merit further discussion.

## A. Evidence of the Two dollar Bill

The majority finds error in the trial court's admission of evidence that Kim used Joy's two-dollar bill at a convenience store about a week after Joy's death. The majority holds that admission of this evidence was an abuse of discretion "without proof of Daniel's direct misappropriation" of the money. It is impossible for this Court to predict what evidence will be admitted and how that evidence will be admitted in a new trial on remand. For instance, evidence of the two-dollar bill may be relevant to Kim's credibility or to Daniel's credibility should either choose to testify. As such, I would leave the admission of this evidence to the sound discretion of the trial court on remand.

## B. Denial of Expert Funds

The majority holds that the trial court abused its discretion in denying Daniel's motion for expert funding under Kentucky Revised Statutes ("KRS") Chapter 31. I disagree. The majority cites to the correct test for determining when an indigent defendant is entitled to receive funding for expert assistance. The trial court must consider "1) whether the request has been pleaded with requisite specificity; and 2) whether funding for the particularized assistance is 'reasonably necessary'; 3) while weighing relevant due process considerations." *Benjamin v. Commonwealth*, 266 S.W.3d 775, 789 (Ky. 2008).

The majority further notes that appellate review of a trial court's denial of expert funds is "limited to the reasons actually presented to the trial court." *Dillingham v. Commonwealth*, 995 S.W.2d 377, 381 (Ky. 1999) (citing *Simmons v. Commonwealth*, 746 S.W.2d 393, 395 (Ky. 1988)). Because of this, I feel it is critical to review exactly what information the trial judge had in front of him at the time he denied Daniel's requests for expert funds.

Daniel's initial motion for expert funding was signed by her counsel on June 11, 2018. Notably, it was not filed until June 20, 2018. However, the trial court presumably was in possession of it prior to that date because the trial court's order denying Daniel's requested funds was entered on June 18, 2018. On June 22, 2018, Daniel filed a motion to reconsider and the trial court held an ex parte hearing on that motion.

Daniel's initial motion for expert funding requested funding to retain Shelly Rice, an accident reconstructionist, to assist in reviewing reports and evidence turned over by the Commonwealth, to conduct additional testing and analysis, and to assist in cross-examining and impeaching the

39

Commonwealth's witnesses. The motion contained no other details about specific assistance sought, such as reports that needed to be reviewed or specific tests that could be completed. Further, this motion was not accompanied by a supporting affidavit by Rice which could have provided details regarding the anticipated content of her testimony. Although an affidavit by an expert is not absolutely necessary to receive expert funding, it can often be valuable guidance in a trial court's determination.

Based on later conversations between defense counsel and the trial court that occurred on the record, it seems likely that the trial court had an off-the-record conversation with defense counsel about this motion. The trial court then entered an order denying Daniel's request for expert funds, noting that the jury must make the ultimate decision on guilt and that effective cross-examination could bring out the evidence the defense sought to be admitted through its requested expert.

Subsequently, Daniel filed a motion to reconsider the trial court's denial of her request for expert funds. In that motion, she made the same general assertions of necessity that she made in her first motion, but additionally stated that Rice:

> would examine the scene, provide information about what proper investigation techniques were used and what proper techniques were not used....[and] provide defense counsel the information that is needed to conduct a proper cross-examination into what should have been done to definitely decide whether a homicide or a suicide took place.

Again, Rice's affidavit did not accompany that motion.

The trial court held an ex parte hearing on the same date the motion to reconsider was filed. At that hearing, defense counsel explained that the medical examiner, the only forensic expert to testify for the Commonwealth, was unable to determine whether Joy's manner of death was homicide or suicide. She further expressed her view that the police conducted an inadequate investigation. Regarding the use of the requested expert, defense counsel stated she hoped an expert would opine that "with the position of the body and blood splatter, our theory [of suicide] is plausible and correct." The trial court asked defense counsel a direct question about whether the requested expert would attempt to testify that it was a suicide based on the scene. Counsel did not directly answer the trial court's question but acknowledged that she had not yet given the expert any evidence and did not know what conclusions the expert would reach after reviewing the evidence. At the end of the hearing, the trial judge told Daniel's counsel that he would let her know if he "changed his mind," effectively denying Daniel's motion to reconsider his prior denial of her request for expert funds.

It was not until August 17, 2016, approximately two months *after* the trial court denied Daniel's request for funding and her request for it to reconsider that decision, and a mere ten days before trial, that Shelly Rice's affidavit was filed in the trial court record. The affidavit was accompanied by a proposed order but not by a renewed motion for expert funds or any other motion. The affidavit was not addressed on the video record until the morning of trial and then only a vague reference was made to "things in the record" that would show the value of an expert.

41

We have previously held that

the appropriate test for determining when an indigent defendant is entitled to receive funding for expert witnesses under KRS 31.110(1)(b), will consider 1) whether the request has been pleaded with requisite specificity; and 2) whether funding for the particularized assistance is "reasonably necessary"; 3) while weighing relevant due process considerations.

*Benjamin*, 266 S.W.3d at 789. This Court's review of a trial court's denial of expert funds, however, is limited to abuse of discretion. *McKinney v. Commonwealth*, 60 S.W.3d 499, 500 (Ky. 2001). This is a deferential standard that only allows for a finding of error if the trial court's decision is "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000). Given the information before the trial court at the time it denied Daniel's requests for expert funds, I cannot hold that the trial court abused its discretion in denying the funds, as Daniel failed to show that her requested expert assistance was reasonably necessary.

I acknowledge that, ideally, indigent defendants should have greater access to funding to obtain expert assistance than the Commonwealth's current process provides. However, granting funds to indigent defendants costs the citizens of the Commonwealth, and the money used for this funding is a finite resource. Trial judges have been placed in the position to act as a gatekeeper to those funds. Thus, this Court, over years of reviewing this issue, has established a test that meets the defendant's due process rights without depleting the Commonwealth's finite resources. As previously explained, this test requires a showing of reasonable necessity. Under the facts of this case,

42

with the reasons presented to him, the trial judge did not abuse his discretion in finding the funds were not reasonably necessary and therefore denying Daniel's request for expert funds.

We need look no further than this Court's opinion just last year in *Commonwealth v. Ferguson*, 581 S.W.3d 1 (Ky. 2019). Before this Court in Ferguson was the issue of whether the trial court erred in denying Ferguson's Rule of Criminal Procedure ("RCr") 11.42 motion for ineffective assistance of counsel. Ferguson argued, among other things, that his trial counsel's performance was deficient because he failed to consult with experts in his preparation for trial and failed to call any expert witnesses at trial. *Id.* at 6. At his RCr 11.42 hearing, Shelly Rice testified on Ferguson's behalf. She opined that, based on her review of the evidence, if she had been able to testify at trial, she would have testified that it was more likely than not that the victim had shot himself, as opposed to Ferguson having shot him. *Id.* This Court, however, found Rice's theories to be "largely fantastical" and held there was not a reasonable likelihood the result at trial would have been any different if Ferguson's trial counsel had received expert assistance. *Id.* at 8.

I acknowledge that the standards by which we review a trial court's denial of expert funds and a trial court's denial of an RCr 11.42 motion are different. However, even when these differences are taken into account, I respectfully assert that an inconsistency exists in these two decisions by this Court. In both cases, the sole question the jury had to decide was whether the victim died by suicide or homicide. In the *Ferguson* case, we held that expert assistance likely would not have changed the result at trial, but in this case the

43

majority has held that the very same expert on that very same issue was reasonably necessary for the defense. Obviously, the facts of the two cases are not exactly the same and the questions before this Court are not exactly the same, but our outcomes should be consistent. I do not believe they are. It is inconsistent for the majority of this Court to believe that very similar expert assistance would not have changed the result in Ferguson's trial but *was* reasonably necessary for Daniel's defense.

Given the deferential standard of review by which we review a trial court's finding that an expert was not reasonably necessary, I cannot find error by the trial court. Daniel had more than enough fodder for effective cross-examination of the Commonwealth's witnesses without the assistance of an expert. Although the medical examiner initially ruled Joy's manner of death to be homicide, she testified that after further review she could not rule out suicide. This fact alone is ripe for cross-examination. The trial court knew of this change of heart at the time it denied Daniel's request for funding. Daniel could have questioned the medical examiner about any additional information she would have needed from the scene to make a more definite determination.

Further, Daniel could, and did, cross-examine the Kentucky State Police detectives about all of the things they failed to do in their investigation. The Kentucky State Police detectives, Detective Stamper and Detective Browning, admitted in their testimony that they did not collect various items from the scene including Daniel's clothing, pillows from the floor, clothing found on the bed and on the floor including an item with suspected blood on it, and sheets and blankets. Also during cross-examination, the detectives admitted that

44

gunshot residue testing was not done on Daniel or Joy and that no blood spatter analysis was completed. Finally, although Daniel makes much of Detective Browning's testimony that he did not know what Luminol was, Detective Stamper, who testified before Detective Browning, admitted during his cross-examination that he knew what Luminol was and that it was not used in this case. Daniel did not recall Detective Stamper to the stand to explain Luminol to the jury.

This Court has the benefit of hindsight in reviewing everything that occurred during the trial and the effect a trial court's pretrial ruling had on that trial. The trial court does not have that advantage, and in determining whether a trial court abused its discretion, we must look at the evidence it had in front of it at the time it made its decision. Additionally, we must be mindful that Daniel was not required to prove that Joy committed suicide in order to be successful at trial; she merely had to create reasonable doubt in the jurors' minds that it was she who murdered Joy. Given all of the circumstances in this case and the information the trial court had in front of it when it made its ruling, I cannot hold the trial court abused its discretion in denying Daniel's request for expert funding, and therefore I dissent from the majority's holding otherwise.

### C. Commonwealth's closing argument

Finally, I would like to address the Commonwealth's comment during closing argument about Daniel's lack of an expert on blood enhancement tests, as it is very troubling to me. Daniel argues to this Court that the Commonwealth's remark was a misstatement that prejudiced Daniel, denying

her right to a fair trial under the United States and Kentucky constitutions. The majority mentions this issue within its discussion of whether the trial court erred in denying Daniel expert funds but does not address this issue on its own. I feel it merits more discussion.

"Great leeway is allowed to *both* counsel in a closing argument. It is just that—*an argument.*" *Slaughter v. Commonwealth*, 744 S.W.2d 407, 412 (Ky. 1987). However, "the fundamental issue is whether the statement is reasonably supported by the evidence." *Murphy v. Commonwealth*, 509 S.W.3d 34, 54 (Ky. 2017) (internal citations and quotation marks omitted). In this case, the Commonwealth's comment about Daniel's lack of an expert on blood enhancement tests was improper. Although the request for expert funding was mentioned at least once during the trial in front of the prosecutor, most of the arguments about this issue were, appropriately and pursuant to statute, ex parte. Further, although the Commonwealth may not have completely understood what expert funding Daniel had requested, its comment during closing argument was still improper. Daniel objected to the comment but did not request any relief. Despite this, it would have been better practice for the trial court to admonish the jury in some way so that it did not hold the lack of an expert against Daniel.

In general, any allegation of prosecutorial misconduct must be viewed in the context of the overall fairness of the trial. *Commonwealth v. McGorman*, 489 S.W.3d 731, 742 (Ky. 2016). To justify reversal, the Commonwealth's misconduct must be "so serious as to render the entire trial fundamentally unfair." *Soto v. Commonwealth*, 139 S.W.3d 827, 873 (Ky. 2004) (quoting

46

*Stopher v. Commonwealth*, 57 S.W.3d 787, 805 (Ky. 2001)). In this case, especially because Daniel did not request any relief from the trial court, I cannot hold that the misstatement by the Commonwealth affected the overall fairness of Daniel's trial to the extent outlined in *Soto*. As such, I would not reverse Daniel's conviction on this issue; however, I discuss it to give some guidance for future trial courts and counsel should a similar situation arise in the future.

In conclusion, although I agree with much of the majority's opinion, I dissent from its holdings regarding the admission of evidence of the shooting in the air incident and the two-dollar bill, as well as its holding regarding the denial of expert funds. Accordingly, I would affirm the judgment of the Breathitt Circuit Court.

Nickell, J., joins.

COUNSEL FOR APPELLANT:

Julia Karol Pearson
Department of Public Advocacy
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

Kenneth Wayne Riggs
Assistant Attorney General

Jesse Robbins
Assistant Attorney General

# Supreme Court of Kentucky

2018-SC-0560-MR

IMOJEAN DANIEL **APPELLANT**

|  | ON APPEAL FROM BREATHITT CIRCUIT COURT |
|--|--|
| V. | HONORABLE FRANK ALLEN FLETCHER, JUDGE |
|  | NO. 17-CR-00098 |

COMMONWEALTH OF KENTUCKY **APPELLEE**

## <u>ORDER CORRECTING</u>

The Opinion of the Court rendered September 24, 2020 is corrected on its face by substitution of the attached Opinion in lieu of the original Opinion.

Said correction does not affect the holding of the original Opinion of the Court.

ENTERED: September 24, 2020

_____
CHIEF JUSTICE