David Louis SOMMERS, Appellant

v.

COMMONWEALTH of KENTUCKY,
Appellee.

No. 89–SC–882–MR.

Supreme Court of Kentucky.

Sept. 24, 1992.

Rehearing Denied Dec. 17, 1992.

Marie Allison, Asst. Public Advocate, Dept. of Public Advocacy, Frankfort, for appellant.

Chris Gorman, Atty. Gen. and Denise Garrison McElvein, Asst. Atty. Gen., Crim. Appellate Div., Frankfort, for appellee.

COMBS, Justice.

David Louis Sommers was convicted in McCracken Circuit Court of two counts of murder, and sentenced to two consecutive 500–year terms of imprisonment. He appeals as a matter of right.

The victims were sisters, 13–year–old Carrie and 12–year–old Stephanie VanMeter. In the summer of 1988, the girls' parents apparently abandoned them in the care of their neighbors, David and Eliza-beth (Sherry) Sommers. In September 1988, the girls' mother petitioned the district court to appoint the Sommerses as her daughters' guardians. Sommers failed to appear at the guardianship hearing, and the petition was never officially granted. The girls continued to live with the Sommerses, however.

On December 1, 1988, the Sommerses' house was destroyed by fire. Carrie's and Stephanie's bodies were discovered in the ruins. Forensic tests indicated that the deaths had not resulted from the fire or from smoke inhalation, but rather from suffocation prior to the fire. Other physical evidence indicated to arson investigators that the fire had been deliberately set.

On December 15, 1988, Sommers was indicted on two counts of murder. The Commonwealth's thesis was that Sommers had previously abused the girls sexually; that he had killed them in order to silence them; and that he had burned the house in an attempt to conceal the homicides.

## I. PRE–TRIAL ISSUES

### A. RECUSATION

The first issue raised on appeal is whether the trial judge abused his discretion in denying the defendant's motion of recusation.

After the indictment, in late December 1988, the news media gave the case extensive coverage. Of particular relevance to this appeal, the reportage included interviews with and unveiled criticism of District Court Judge Graves, who had presided over the guardianship proceedings begun in September. We cite examples of the media coverage, all taken from the *Paducah Sun*. On December 15, 1988, under the front-page banner "Sommers indicted in sister deaths," and the sub-headline "Officials say system failed due to lack of knowledge, personnel," the lead paragraph read:

> McCracken County District Judge Bill Graves said if he had known more about the background of David L. Sommers, he probably would not have granted him limited guardianship of two teen-age

girls he is accused of murdering earlier this month.

The article went on:

"Hindsight is always 20–20, but these types of guardianships are routine," Graves said.

.    .    .    .    .

Why were Sommers and his former wife, who were under indictment on drug charges, granted guardian [sic] of the two girls on Sept. 26?

.    .    .    .    .

Graves said that at the time he signed the guardianships for the VanMeters in September, he wasn't aware that Sommers had been indicted two months earlier on four drug charges.

He also said he wasn't aware that Sommers had been charged a month earlier in Christian County with sexual abuse of a five-year-old girl.

On the following day the *Sun* reported:

District Judge Bill Graves said today that he never signed a petition by Angela VanMeter making Sommers and his ex-wife, Elizabeth, the girls' guardians.

.    .    .    .    .

Graves said he didn't have all the evidence Thursday when he told The Paducah Sun he apparently signed the petition, validating it.

.    .    .    .    .

"I assumed I had signed it routinely," Graves said today, explaining why he thought he had signed the paper.

An editorial appearing on December 18, 1988, and entitled "Who protects the children?" commented:

So there were failures at every step in this tragedy:

1. Judge Graves' casual handling of these serious matters means that he probably would have entrusted two young girls to the care of a man under drug indictment and with a child-molestation warrant pending.

.    .    .    .    .

4. The state, which has a wide variety of child protection services, didn't have a chance to protect these two because nobody ever asked for its help.

In yet another interview, reported on December 22, 1988:

Graves said that if the documents had been presented to him he would have been obligated under the guardianship law to sign them....

A story appearing on December 29, 1988, under the headline "Graves says change needed in state's guardianship law," began:

The fact that David Sommers ... was facing drug trafficking charges when he sought guardianship of two sisters whom he allegedly killed later was not in itself enough to rule against him, District Judge Bill Graves said.

.    .    .    .    .

Graves said that had Sommers been in jail on that [sexual abuse] warrant when the petition hearing was scheduled, "I could have refused him (guardianship) because that relates to his capacity to care for the girls. But once he made bond, he'd have been eligible again."

In January 1989, Judge Graves was appointed interim circuit judge, to serve until the November election (in which he was a candidate). In that capacity, Judge Graves presided over the trial of the instant case, which began on October 23, 1989.

On September 11, 1989, the defense, citing KRS 26A.015 and SCR 4.300 (the Code of Judicial Conduct), moved Judge Graves to surrender the case. The defense argued that Judge Graves' impartiality might reasonably be questioned in view of all the circumstances—his involvement in the guardianship proceedings, his statements to the press following the indictment, his extra-judicial knowledge of Sommers' background, and his insistence on an October 23rd trial date while being a candidate for election in November, juxtaposed with the adverse publicity which he had received as a result of the girls' deaths.

Canon 3 C(1) of SCR 4.300 provides, in part, that "A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned...." According to KRS 26A.015:

(2) Any justice or judge of the Court of Justice ... shall disqualify himself in any proceeding:

. . . . .

(e) Where he has knowledge of any other circumstances in which his impartiality might reasonably be questioned. Viewed in totality, the circumstances of the instant case persuade us that Judge Graves' impartiality might reasonably be questioned, and moreover that Judge Graves had knowledge of these circumstances.

Underlying the media coverage concerning Judge Graves and the guardianship question were the more or less concealed presumptions that the deaths were homicides and that Sommers was guilty. Absent those presumptions, there would have been no reason to link so conspicuously the indictment of Sommers with criticism of "the system," and particularly Judge Graves. The coverage began with the premise that the child-protection system had failed, and undertook to explore how and why. But the premise itself was valid only if the children's presence with Sommers exposed them to unusual peril, which in turn was evident only if Sommers was guilty.

The same bias was attributed to Judge Graves: "Officials say system failed ..."; "Graves says change needed in state's guardianship law." From his own statements that he would have denied the petition had he been aware of Sommers' background, and that, "Hindsight is always 20–20," one might reasonably infer that Judge Graves, consciously or otherwise, in fact shared the presumption. While some of his statements clearly constituted explanation of procedures of the court, these statements as clearly did not. In any event, it appears to an objective observer that Judge Graves, too, felt that the law had failed. As we have said, that publicly expressed view necessarily carried with it a presumption of Sommers' guilt, which could only be reinforced by knowledge that Sommers had been charged with other crimes, including child sexual abuse. And if Sommers was presumably guilty it follows that he was

presumed responsible for the unfavorable publicity, and likely embarrassment, to which Judge Graves was subjected. The negative information about Sommers was likewise available to the reading and viewing public, who also perhaps absorbed the biases exhibited in the daily press coverage. Aware as well of much of the state's evidence, surely the public generally believed Sommers guilty, more likely than not, and would applaud a conviction. It would not be unreasonable to argue that Judge Graves stood to gain significant public favor by conducting a trial in which a guilty verdict was returned in this high-profile case, shortly before the November election.

■ Were it not for this last consideration, we might be swayed by the Commonwealth's argument that the motion recusing was not timely filed. It may well be unreasonable to question a judge's impartiality months after all the circumstances tending to justify the challenge are known, and after the case has substantially progressed. Here, however, the order setting the case for trial on October 23, and overruling the defense motion to set the trial for February, was entered on August 30, 1989. This proximity of the trial date to the forthcoming election, in view of all the circumstances, was a substantial and, we believe, not unreasonable factor in the motion of recusation filed on September 11.

We are confident of Judge Graves' integrity. We do not conclude that he entertained a conscious bias, or that his judicial performance was influenced by improper sub-conscious motivation. But the issue is not whether Judge Graves was in fact impartial. On the true issue, i.e., whether his impartiality *might reasonably be questioned*, we hold that under the circumstances it was indeed reasonable for the defense to question Judge Graves' impartiality, and that denial of the motion of recusation constituted an abuse of discretion.

## B.  DEFENSE EXPERTS

■ The second issue on appeal is whether the trial court erred in denying the

defense motion for the funding of a pathologist and an arson investigator to serve as consultants and/or witnesses for the defense.

It is conceded that Sommers was an indigent defendant. Recognizing that due process requires that indigence may not deprive a criminal defendant of the right to present an effective defense, KRS 31.110(1) provides that a needy person charged with a serious crime is entitled:

(a) To be represented by an attorney to the same extent as a person having his own counsel is so entitled; and

(b) To be provided with the necessary services and facilities of representation including investigation and other preparation. The courts in which the defendant is tried shall waive all costs.

KRS 31.185 provides:

Any defending attorney operating under the provisions of this chapter is entitled to use the same state facilities for the evaluation of evidence as are available to the attorney representing the Commonwealth. If he considers their use impractical, the court concerned may authorize the use of private facilities to be paid for on court order by the county.

In *Hicks v. Commonwealth*, Ky., 670 S.W.2d 837 (1984), we interpreted the word "necessary" in KRS 31.110(1)(b) to mean "reasonably necessary." In that case, a state crime lab serologist, after performing sophisticated tests, gave evidence which strongly indicated that blood found at the crime scene was the defendant's blood. We pointed out that the defendant had made no showing before the trial court as to how he would be assisted by a defense serologist, and had made no showing on appeal that the trial court had abused its discretion. We also observed that Hicks had not been prejudiced, because a medical doctor who did testify for the defense revealed an expert knowledge of the tests conducted by the state serologist, and because the defense received documentary assistance from its proposed experts, which helped to assure thorough cross-examination of the state's witness.

In *Smith v. Commonwealth*, Ky., 734 S.W.2d 437 (1987), the defendant had admittedly shot and killed a number of people, yet requested funding for a pathologist and a ballistics expert. We affirmed the denial of funding, saying:

Here Smith seeks to prove his mental state by the testimony of either a ballistics expert or a crime scene reconstruction witness.... We do not believe that the expert assistance Smith claims he needed had anything to do with his defense which was that the murders were wanton, rather than intentional. The evidence he believed he needed was available through the use of state experts and facilities. He did not take advantage of the assistance available. At trial he cross-examined both the firearms examiner and the police sergeant in charge of the investigation of the homicides. The firearms examiner indicated that he had discussed the case with and cooperated with the defense attorney. Under the circumstances, it does not appear that the services of an independent ballistics expert were reasonably necessary.

*Id.* at 447, 448.

In *Simmons v. Commonwealth*, Ky., 746 S.W.2d 393 (1988), the defendant was evaluated, pursuant to a joint motion, by a psychiatrist and a social worker at the Kentucky Correctional Psychiatric Center. It appears that the expert played no substantial role in the prosecution. The psychiatrist reported to the court his opinion that the defendant was competent to stand trial. On the other hand, both the psychiatrist and the social worker testified in behalf of the defendant during the sentencing phase. In affirming the trial court's denial of funds for the appointment of two independent psychiatrists, two independent psychologists, and one licensed clinical social worker, we said:

The appellant failed to show a necessity for the expert assistance he requested. He stated in general terms only that expert assistance was needed to prepare adequately for trial and possible sentence hearing. He did not state the names of any doctor or social worker that he desired to examine him, nor did

he furnish any estimate of the cost. He further did not state what he expected to show or in what manner the requested assistance would of any specific benefit to him. He made no challenge to the competency of [the psychiatrist] or that [the psychiatrist] was uncooperative with him or was not available for consultation.

. . . . .

We hold that appellant was provided competent expert psychiatric and social worker assistance, which he used in his trial, and that he failed to establish that further expert assistance was reasonably necessary for his defense.

*Id.* at 395, 396.

The present case is vastly different from those predecessors. In *Smith,* only Olympian speculation would suggest that an independent pathologist could substantially assist the defense, where the defendant admitted shooting the victims to death, or that an independent ballistics expert could provide valuable evidence as to the defendant's mental state. In the present case, contrariwise, both the cause of death and the genesis of the fire were matters of crucial dispute, resolvable only through circumstantial evidence and expert opinion.

Unlike Hicks, the present appellant did not have another witness with relevant expertise. Unlike Simmons, he did not even have the assistance of state-employed experts. Moreover, in *Simmons,* the only issue subject to expert testimony, at least prior to the sentencing phase (in which the experts testified for Simmons), was whether the defendant was competent to stand trial. Whereas in *Simmons* the Commonwealth used no expert testimony to prove any element of the charged offense, the case against Sommers was established almost entirely by means of evidence and opinions provided by no less than six expert witnesses: the Chief Medical Examiner for the Commonwealth; a forensic science specialist from the medical examiner's toxicology lab; the coroner; a Kentucky State Police hazardous devices investigator; and two employees of the State Fire Marshal's office.

Finally, unlike either Hicks' or Simmons', Sommers' counsel were at pains to demonstrate to the trial court the necessity for defense experts. In a memorandum in support of its motion, the defense pointed out that there were no eyewitnesses to the alleged offenses, and the defendant denied committing either homicide or arson. It advised the court that there were material issues as to the cause of death and the nature and cause of the fire, and that experts from the medical examiner's office, the fire marshal's office and the Kentucky State Police were witnesses for the Commonwealth. It argued that different experts might observe the facts differently, or might reach different conclusions even given identical facts. Counsel maintained that without expert assistance he could not effectively investigate the circumstances, choose a course of defense, cross-examine the state's witnesses, or challenge the validity of their opinions.

At a lengthy pre-trial hearing held on September 5, 1989, counsel explained the benefits which the defense expected to derive from expert assistance. For example, observing that the pathologist's report was couched in much technical language, it was argued that an expert was necessary in order to understand the report and to identify any inconsistencies or exculpatory facts. Further, observing that the Commonwealth's experts had concluded that the likely cause of death was suffocation prior to the fire (based principally upon the normal level of carbon monoxide found in the blood, the looseness of the teeth of one of the victims, and the position of one of the bodies), it was convincingly argued that another expert might well find the circumstances consistent with a cause of death other than intentional suffocation, e.g., accidental death resulting from an accidental fire. Counsel also maintained that the state's witnesses had demonstrated an unwillingness to cooperate with the defense.

At a subsequent hearing, counsel filed the affidavit of the State Fire Marshal, which affidavit included the following:

3. It is the duty of the State Fire Marshal and his agents and employees to consult with, as well as assist, law en-

forcement, both Kentucky State Police and local law enforcement agencies.

4. Because of the duties of this office, it would be a conflict of interest to be a "court-appointed defense consultant" in any case, but especially cases in which this office might be a material witness on behalf of the Commonwealth.

. . . . .

6. If forced to act as a defense consultant, this would place any member of the Fire Marshal's Office in the position of having to report any incriminating evidence during the course of said assistance for consultation, and this would create practical difficulties both for the fire marshal involved as well as the defense lawyer. Further, said person would be placed in the position of testifying, in effect, against another fire marshal.

Counsel also presented the affidavit of Captain Larry Fentress, Legal Officer with the Kentucky State Police, which affidavit included:

8. Affiant states that the assignment of a state police officer, sworn to take law enforcement upon probable cause to believe that any violation of law has occurred, to assist in the defense of a criminal defendant, places the officer in a position of a possible conflict of interest should he discover additional incriminating evidence during the course of his assistance to the public defender.

The defense informed the court that it had contacted a number of independent experts, with an eye to economy, and presented estimates of the costs. The defense moved that, should the request for independent experts be denied, the court "at an absolute minimum" appoint the office of the State Medical Examiner, the State Fire Marshal's office and the Kentucky State Police to provide defense consultants, under orders to observe confidentiality.

To us, it is clear from the record that the defense demonstrated "reasonable necessity," and was entitled to the assistance of an independent pathologist and an independent arson expert or the equivalent. We hold that the denial of the motion to authorize funds to provide such assistance constituted prejudicial error.

## II. GUILT/INNOCENCE PHASE ISSUES

### A. EVIDENCE

#### 1. OTHER CRIMES

Appellant argues that he was prejudiced by the playing before the jury of a tape-recorded interview which he had given to a newspaper reporter shortly after the indictment. In the interview, Sommers mentioned a separate pending charge of child sexual abuse. Objection had been raised to the playing of the tape on grounds that it had not been provided to nor previewed by the defense. However, counsel acceded to the court's decision to allow review of the tape after it had been played to the jury. The Commonwealth maintains that the issue has not been preserved. The question of admissibility is not squarely framed. Because we are reversing on other grounds, it is unnecessary to discuss this question in detail. Surely prior to a second trial, the defense will have an opportunity to examine the recording and move for redaction before it is presented to the jury.

Appellant also complains of a reference to the sexual abuse charge by Sherry Sommers, a Commonwealth's witness in rebuttal. Again the Commonwealth questions preservation, and whether the alleged error was prejudicial. As we are reversing on other grounds, we need not decide the issue in its present posture.

■ Appellant maintains that the jury was made aware that Sommers had been charged with drug trafficking. A witness for the defense mentioned drug trafficking charges against Sherry Sommers. The prosecutor objected, adding, "We've not brought that up, but if he's going to talk about Sherry and her drug trafficking charge, I think he ought to be admonished to tell the whole story." The court instructed the witness not to mention other crimes, following which the prosecutor commented, "Well, it seems hardly fair to me now, your Honor, that Mr. Sommers

has not been mentioned in that same situation." The question was not preserved, but it is manifest that the prosecutor's comments, in open court, informed the jury of prejudicial facts not properly in evidence, and should not be repeated in the event of a second trial.

## 2. "CHOKE THE BABY"

A neighbor of the Sommerses testified for the Commonwealth that Sommers' two-year-old daughter (whom he had removed from the burning house), while playing with the neighbor's son after the fire, had put her hands around his neck and shook him, saying.... Upon objection, the witness was not allowed to quote the child. Later, cross-examining the defendant, the prosecutor referred to the described incident and asked if Sommers had observed any similar activity in his own house. Sommers responded that the conduct resembled a game, "choke the baby," which Sherry had frequently played with the child. In closing argument, the prosecutor inaccurately paraphrased the neighbor's original testimony to be:

[S]he said the little girl went up to her own son ... put her hands around his neck and started choking and said, "Choke the baby, choke the baby."

He went on to argue:

Well, ladies and gentlemen, as sick and as sad as it seems, just what if that little [child] saw a murder in her house that night and reenacted it for us over there next door ...?

The defense did not object to the questioning of Sommers nor to the prosecutor's argument. The original objection had been sustained, and no further relief was requested. We will therefore not review the issue, beyond observing that the medical examiner had positively testified that the victim "was not manually strangled," which invites one to question the relevance of the entire episode.

## 3. HEARSAY

■ Sherry Sommers was called as a witness by the Commonwealth. She testified that she had accused the defendant of being a child molester. The prosecutor inquired as to the reason for her accusation. Upon objection to hearsay, the court instructed the witness not to repeat statements made by others out of the defendant's presence. She then testified, without further objection, that she had had conversations with the VanMeter girls, as a result of which conversations she, and then she and the girls together, confronted Sommers with the accusation. She described his reaction:

[F]irst, he tried to deny it, but then he said he did it and he was sorry and he would never do it again.

On another occasion, according to the witness:

He said, "I told you I'd never do it again and I won't, but if anybody ever finds out, I'll kill you all."

Appellant now complains that the testimony implies the very hearsay to which objection had been raised, i.e., that the children had told the witness that Sommers had molested them. The fact which the Commonwealth was seeking to prove, in order to establish a motive for homicide, was that Sommers had sexually abused the children. The truly damaging evidence in that regard was the testimony that Sommers had admitted the fact. The evidence as to the circumstances which culminated in the admission was not offered for the purpose of proving its own content, but merely to provide a foundation. Admission of that evidence was proper in the present context.

## 4. REMOTE FELONY

■ The defendant testified in his own behalf. The prosecutor's first question on cross-examination was whether Sommers had ever been convicted of a felony. The defense objected on grounds that no hearing had been held to determine whether the defendant would be unduly prejudiced by such evidence. *Commonwealth v. Richardson*, Ky., 674 S.W.2d 515 (1984). After a brief bench conference during which the court was informed that Sommers had been convicted of burglary some eighteen years before, the objection was overruled. The

witness answered, "Approximately 17 or 18 years ago, yes." The defense did not request that the jury be admonished to consider the evidence only with respect to credibility. *See Hall v. Commonwealth,* Ky., 817 S.W.2d 228 (1991).

On appeal, Sommers contends that, in view of the remoteness of the prior felony, the trial court abused its discretion in permitting the question. Under *Richardson, supra,* the remoteness of the prior felony conviction is relevant to the determination of whether the evidence will be unduly prejudicial. As a conviction recedes into the past, its value on the question of credibility wanes proportionately, while the prejudice as to guilt is less easily dispelled. Having reviewed the record extensively, we are persuaded that the evidence of a single 17- or 18-year-old felony was minimally relevant to credibility, and was highly and unduly prejudicial on the issue of guilt. We hold that permitting the testimony over objection constituted an abuse of discretion.

### 5. OTHER ISSUES

Appellant complains of numerous instances of alleged misconduct on the part of the prosecutor, and also of his own counsel's pursuit of "an alternative inconsistent defense." Because these matters are not properly preserved, and because manifest injustice has not been demonstrated, and because neither the prosecutor's nor defense counsel's specific conduct upon re-trial may be accurately predicted, we decline to review these issues.

### III. PENALTY PHASE ISSUES

■ During the penalty phase of trial, the court admitted over objection evidence of a prior misdemeanor conviction based upon a guilty plea entered by counsel in Sommers' absence. The record in the case reflected that Sommers was not present when the plea was entered. In *Woods v. Commonwealth,* Ky., 793 S.W.2d 809 (1990), we held that a defendant subject to enhanced penalties for a subsequent offense was entitled to suppression of evidence of the earlier conviction where the record showed that he had not been present when the guilty plea was entered by counsel. *Cf. Boykin v. Alabama,* 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). While we are not convinced that *Woods* controls in the present case, because this is not a case of a statutorily enhanced penalty imposed for a subsequent conviction, nevertheless the Commonwealth has conceded error on this point, and it is therefore the law of this case that evidence of the misdemeanor must be suppressed upon proper motion in the event of a second sentencing phase.

The appellant further claims that the jury was misinformed as to parole eligibility upon conviction of a capital offense, and further that the 1,000-year sentence imposed is illegal and unconstitutional. The issue was not preserved for review. Furthermore, we will not presume that the defendant will be convicted and that a similar sentence will be imposed upon a second trial. We therefore do not review this issue.

Finally, the appellant submits that KRS 532.055, the Truth-in-Sentencing statute, violates both the Kentucky and the United States constitutions. In a case in which the sentence is to be vacated and a new trial granted, we are not inclined to re-examine the decisions in *Commonwealth v. Reneer,* Ky., 734 S.W.2d 794 (1987) and *Huff v. Commonwealth,* Ky., 763 S.W.2d 106 (1988), and decide a constitutional question in a case in which the issue may well be moot.

The conviction is reversed, the sentence vacated, and the case remanded to McCracken Circuit Court for further proceedings consistent with this opinion.

STEPHENS, C.J., and LAMBERT and LEIBSON, JJ., concur.

REYNOLDS, J., dissents by separate opinion, in which SPAIN and WINTERSHEIMER, JJ., join.

WINTERSHEIMER, J., dissents by separate opinion, in which REYNOLDS and SPAIN, JJ., join.

REYNOLDS, Justice, dissenting.

Respectfully, I dissent.

The trial court did not abuse its discretion when appellant's motion of recusation was denied. KRS 26A.015(2)(a), (e) and SCR 4.300, Canon 3 C(1) provide that a judge should disqualify himself in any proceeding where he has a personal bias or prejudice concerning a party and that a judge should disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

The trial judge's comments, which were the basis of the recusal motion, were not reasonably questioned by appellant. The recusal motion was only made some three weeks before commencement of trial; only made nine months after the comments by the trial judge; and only made after the trial judge had ruled on 19 different defense counsel motions. The recusal motion, as the Commonwealth remarked, should not be used as a last resort when the outcome on motions and hearings do not meet with counsel's desires.

The majority concedes appellant's recusal motion was not timely filed. It speculates, however, that the ruling, which was in close proximity to the forthcoming election, was a factor in the trial judge's decision. Why should this Court speculate that a judge's decisions are political in the absence of direct evidence? Should we increase our scrutiny and speculation so as to invalidate judicial decisions in high profile cases during an election year? This Court is not to be cast in the role of second guessing trial court decisions in the absence of a clear abuse of discretion.

The trial court did not abuse its discretion in denying the defense counsel's motion for funding of a pathologist and an arson investigator. It is axiomatic that indigent defendants are entitled to reasonably necessary expert assistance. *Young v. Commonwealth*, Ky., 585 S.W.2d 378 (1979). Implicit in this standard is that some discretion rests with the trial court. *Hicks v. Commonwealth*, Ky., 670 S.W.2d 837 (1984). The trial court discretionally declined to expend public funds for defense experts. The court on two different occa-

sions heard evidence about defense experts. The trial judge offered suggestions regarding persons the defendant could consult, but few were actually utilized.

Contrary to the majority opinion, the appellant could have had the assistance of state experts, but indicated that he did not want the use of state experts or facilities. Sommers maintains that refusal was based on the fact that the state experts were not "defense loyal" or "defense oriented." In essence, the experts had conducted "directive research," that is, research to support a certain conclusion. The appellant, however, never challenged the experts at either hearing. The court is not in the ready position to determine, nor should it be, whether a particular expert is prosecutorial or defense oriented.

Additionally, appellant never made a clear showing as to what his experts would show or in what manner his experts would assist him. Appellant mentioned other potential expert witnesses, but failed to mention the name of some of them and estimates of cost. Clearly the trial courts are not required to provide funds for defense counsel's fishing expeditions. *Hicks; Simmons v. Commonwealth*, Ky., 746 S.W.2d 393 (1988). There is no violation of due process in the refusal to provide for expert witnesses where the defense offers little more than an undeveloped assertion that the requested assistance would be helpful. *Hicks, supra.* Appellant's assertion was simply a fishing expedition to find a defense oriented expert that would testify favorably. This type of activity should not be condoned.

The remaining issues, except for the introduction of the prior felony conviction, were either, as the majority concedes, not preserved or harmless. The question of appellant's prior felony was properly presented by the Commonwealth. *Commonwealth v. Richardson*, Ky., 674 S.W.2d 515 (1984). Prior to permitting the question the trial court should have determined the prejudicial effect, however, the trial court held a bench conference as to the prejudicial effect after the defense objection and before appellant's answer. This was harm-

less in this instance, since the prior conviction about which the appellant subsequently testified was 17 or 18 years old. *See Richardson, supra.*

I would affirm the conviction.

SPAIN and WINTERSHEIMER, JJ., join this dissent.

WINTERSHEIMER, Justice, dissenting.

I must respectfully dissent from the majority opinion because the trial judge did not abuse his discretion when he refused to recuse himself, and the trial judge did not abuse his discretion when he denied a motion for a defense-oriented pathologist and arson expert.

The motion to recuse was filed on September 11, 1989, approximately 4 weeks before the scheduled trial. No affidavit was filed in support of the motion, but copies of ten newspaper articles were attached to the memorandum filed by Sommers' counsel. Seven of the articles mentioned Judge Graves. The newspaper articles indicated that Judge Graves made remarks to a reporter without checking the records first. The judge told a reporter that as a district judge he had signed papers granting Sommers' guardianship over the two children who had died in the fire. Judge Graves later corrected his comments and spoke to reporters to clarify what had actually happened in district court. The mother had filed a petition to appoint Sommers guardian of her two children and Judge Graves stated that he never ruled on the matter because Sommers did not appear in court on the morning it was scheduled for hearing. Consequently, Judge Graves never saw Sommers nor did he sign an order granting him guardianship of the two children. The school attended by the two girls treated the initial petition presented to them by the mother and Mrs. Sommers as a court order and thus erroneously indicated a guardianship of Sommers on the school records.

In this situation the motion to recuse the trial judge was not timely filed as provided in *Kohler v. Commonwealth,* Ky., 492 S.W.2d 198 (1973) and *Murray v. Commonwealth,* Ky., 473 S.W.2d 150 (1971).

Promptness in asserting disqualification is necessary to prevent a party from awaiting the outcome before taking action. *Crowders v. Conlan,* 740 F.2d 447 (6th Cir.1984).

The record shows that Sommers was indicted for the murders on December 15, 1988. Six of the seven newspaper items which mention Judge Graves were published in December, 1988. Sommers or his counsel waited nine months before filing his motion to recuse on September 11, 1989.

Originally, Sommers was represented by two lawyers who filed 27 motions prior to the date of filing of the motion to recuse. On March 22, 1989, Sommers filed a motion for change of venue and the memorandum in support of the motion contained approximately 25 newspaper articles. Of these nine are reproduced in support of the motion to recuse which was filed six months later. Consequently at least two of the defense team were aware of Judge Graves' statements to the press by March 22, 1989, when the motion for change of venue was made. If Sommers believed these statements provided a basis for a complaint about bias on the part of the trial judge, he should have moved to recuse him at that time. The September 11, 1989 motion was made four weeks before the October trial date. By that time, Judge Graves had ruled on approximately 19 defense motions and had already conducted numerous hearings related to the substance of the case. A review of the record demonstrates that Sommers waited until considerable work had been completed to file his motion to recuse. Recusal should not be used as a last resort when the outcome of motions and hearings do not please any counsel.

Although it is not entirely clear from the record, a third defense counsel entered the picture when one of the original team became ill. The motion to recuse was signed by the third counsel alone. A review of the record indicates that there was some irritation on the part of the trial judge directed to the new third counsel for a possible delay in bringing the motion to recuse. There is nothing to indicate that the brief irritation was directed to the defendant.

The new counsel was later allowed to put in by avowal what his witness would have testified to regarding the television newscasts of December 15 and 16, 1988.

The motion to recuse was not timely and it was not reversible error for the trial judge to overrule it. If Sommers or his counsel believed that the trial judge was biased, recusal should have been sought at once; it was not.

A careful examination of the record reveals that Sommers received a fundamentally fair trial. A judge is not disqualified merely because of prior participation in the case in some judicial capacity. *Poorman v. Commonwealth*, Ky., 782 S.W.2d 603 (1989); SCR 4.300; Code of Judicial Conduct, Canon 3.

Although Judge Graves was a district judge when the petition for guardianship was filed, he never had an opportunity to rule on the question because Sommers did not appear for the hearing. Judge Graves never saw Sommers and did not make a determination as to the guardianship. In a trial for murder, the judge was not reviewing anything even remotely related to the guardianship issue. There was no testimony at the murder trial regarding this issue. Sommers and his wife testified that the girls were living with them because their parents had apparently abandoned them. No mention was made of a petition for guardianship. A review of the conduct of the trial judge during the trial reveals no evidence of bias or impartiality. *See Marlowe v. Commonwealth*, Ky., 709 S.W.2d 424 (1986).

The trial judge also did not abuse his discretion when he denied Sommers' motion for funds for a defense-oriented pathologist and arson expert.

Sommers stated that he did not want to use state experts or facilities because such facilities were impractical and all the witnesses were for the Commonwealth. Clearly Sommers has waived any argument about the inaccessibility of state facilities. They were available to him but he did not choose to accept their assistance.

K.R.S. 31.185 provides that indigent defendants are entitled to use state facilities

for the evaluation of evidence. *Young v. Commonwealth*, Ky., 585 S.W.2d 378 (1979). Here, defense counsel requested and received the use of state facilities for a psychiatric evaluation of Sommers. Obviously, defense counsel was satisfied that the state facility could give an objective independent evaluation of his client. However, defense counsel claims an implied bias for the prosecution among the state facilities relative to a pathologist and arson investigator. I find no merit in this contention. Trial judges are not required to provide funds for defense experts for mere fishing expeditions on the part of the defense. *Hicks v. Commonwealth*, Ky., 670 S.W.2d 837 (1984).

Pursuant to the standards set out in *Simmons v. Commonwealth*, Ky., 746 S.W.2d 393 (1988) and *Hicks, supra*, Sommers never made the required showing of reasonable necessity. The trial judge properly refused to expend public funds on the defense counsel's request.

I would affirm the conviction in all respects.

REYNOLDS and SPAIN, JJ., join in this dissenting opinion.