RENDERED: FEBRUARY 18, 2021
TO BE PUBLISHED

# Supreme Court of Kentucky

2018-SC-0577-DG

ABBOTT, INC.                                            APPELLANT

                     ON REVIEW FROM COURT OF APPEALS
V.                              NO. 2016-CA-0394
                   HOPKINS CIRCUIT COURT NO. 08-CI-00177

SAMUEL GUIRGUIS; DIANA P. HERRIN;                  APPELLEES
PATSY E. HOLLAND; HOMESTEAD
AUCTION & REALTY, INC.; MICHAEL
RUSSELL; SHARON RUSSELL; JAMES C.
SPEAKS; DARRIN G. TABOR; THE ESTATE
OF JOHNNY BROWN RUSSELL, BY AND
THROUGH ITS EXECUTOR, WARREN K.
HOPKINS AND DWIGHT E. WEST

**OPINION OF THE COURT BY JUSTICE VANMETER**

**<u>VACATING AND REMANDING</u>**

This case involves two primary issues, mandatory recusal of the trial court judge and the interpretation of deeds. While we hold that the Hopkins Circuit judge in this instance was required to recuse, thereby necessitating our setting aside the judgment, we note that interpretation of deeds and the devolution and ownership of a right of way following a railroad's abandonment are matters of law, which an appellate court is to review *de novo*. Based on that standard of review, we give direction for that interpretation on remand.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

The uncontested facts in this case are that prior to 2007, members of the Russell family owned over 1,000 acres of land in Hopkins and Christian Counties.  This property had been assembled over time and was comprised of twelve tracts.  The property was bisected by a railroad which had been originally constructed in the 19th century.  In 2007, the Russells conveyed the property to West and Speaks.[1]  Approximately six months later, West and Speaks conveyed the property to Samuel Guirguis.  Following Guirguis' purchase,[2] he became aware that Abbott, Inc., whose president was William Donan, claimed ownership of the railroad bed.  Guirguis filed this action in early 2008 claiming fraud by West and Speaks and the real estate agents involved in the sale.  Guirguis' claim was that they had mispresented, and he had believed, the property was a contiguous tract of 1,066 acres.  The action did not originally include Abbott as a party.

Abbott's claim to the railroad bed was initially based on a 2005 quitclaim deed from the Paducah and Louisville Railroad ("P&L") for a four-mile strip of the railroad bed, sixty-six feet wide.[3]  P&L's predecessors had acquired the

---

[1] Dwight West and Brenda West, spouses, and James Speaks.  Ms. West is now deceased and Dwight West's participation in this action is individually and as Executor of her estate.

[2] A factual dispute may exist as to when Guirguis became aware of Abbott's claim of ownership.  Because of our analysis of uncontested facts, resolution of this dispute may be unnecessary.

[3] Abbott's main property lay to the east of Guirguis' property.  Abbott's purpose in acquiring the railroad bed was to gain additional access to its property from the west, and to attempt to limit trespassing on its property via the former railroad bed.

right-of-way for the line by multiple deeds, but as to the portion of the right-of-way bisecting Guirguis' property, no deed has ever been located. P&L, the last railroad company to operate the line, formally abandoned the line in 2003 by filing a Notice of Abandonment with the Surface Transportation Board, formerly the Interstate Commerce Commission.

Following the filing of Guirguis' action, the trial court granted West and Speaks' motion to amend their pleadings to add a cross-claim against Abbott. After filing its initial pleading, an answer to the cross-claim, Abbott filed a motion for the circuit judge, James Brantley, to recuse.[4] The basis for recusal was that in November 2004, William Donan, Abbott's President, discovered future judge Brantley, his son, and another man duck hunting on Abbott's land.[5] An exchange of letters followed between Donan, Brantley and the other man, in which Donan accused Brantley of trespassing and installing duck blinds on his land. The 2004 events were not, however, the end of the incident. On November 2, 2005, attorney William G. Deatherage, Jr.,[6] on behalf of

---

[4] The fact that Abbott filed its answer and in short order thereafter filed its recusal motion is important since no argument exists that recusal was waived. *See Johnson v. Commonwealth*, 231 S.W.3d 800, 809 (Ky. App. 2007) (stating "[a] party alleging that a trial judge should recuse . . . must move for recusal immediately after discovering the facts upon which the disqualification rests[]"); *see also Bussell v. Commonwealth*, 882 S.W.2d 111, 113 (Ky. 1994); *Bailey v. Bailey*, 474 S.W.2d 389, 391 (Ky. 1971).

[5] At the time of the incident, James Brantley was an attorney in Dawson Springs. In 2006, he was elected Judge of the Fourth Judicial Circuit, a one-county circuit consisting of Hopkins County. Judge Brantley retired in 2019.

[6] Coincidentally, attorney Deatherage represents Guirguis in this matter.

3

Brantley and his son, sent Donan a letter regarding subsequent statements allegedly made by Donan. The letter stated:

Re: Alleged Remarks

Dear Bill:

This letter is sent to you on behalf of James C. (Jim) Brantley and his son, William P. (Will) Brantley, who are represented by this law firm.                                          .

According to Mr. Brantley, you allegedly have commented to a prosecutor, and possibly to judges of the Hopkins District Court in Madisonville, Kentucky, that Jim Brantley has encouraged others to trespass on your land, and that Will Brantley was with others when they trespassed on your land. Both Jim Brantley and Will Brantley insist that, if such accusations were in fact made, they are false and not true.

Apparently, this issue has arisen in connection with a criminal case pending in the Hopkins District Court whereby Lester Crook and Randy Orten are accused of criminally trespassing on lands owned or controlled by you and/or by Ray Robinson. According to Jim Brantley, he received information that you reportedly stated that Jim either encouraged Mr. Crook and Mr. Orten to enter the subject lands, or that he had prior knowledge of their intent to do so. Jim also reports that he was informed that you may have accused his son, Will, of being with Mr. Crook and Mr. Orten when they allegedly were on the land, but that Will somehow avoided detection.

Both Jim and Will Brantley are concerned about any false accusations that may have been made concerning them. Each is particularly concerned with preserving his reputation, and each does not want any false accusations or rumors to be circulated about him. Jim and Will Brantley regard all such statements to be defamatory and actionable.

The purpose of this letter is to politely and respectfully request that, if you have made statements similar to those mentioned herein, you cease doing so immediately. Further, if you have made statements similar to those mentioned herein, it is requested that you go to those to whom or before whom the statements were made; that you withdraw the statements; and, that you inform those persons that you had no factual basis for making the statements. On the other hand, if you believe that you do have facts to support any such statements made by you, you are requested to communicate those facts to me without delay.

4

Neither Jim nor Will Brantley wants this matter to go any further. They merely want the statements to stop, and they want those to whom the statements were made and those who may have heard the statements to be informed that the statements were incorrect.

Your prompt attention to this matter will be greatly appreciated. Should you have any questions or concerns, please contact me.

Donan tersely responded that "truth was an absolute defense."

At a pre-trial conference in January 2009, Judge Brantley described the events as "a disagreement over duck-hunting territory[,]" and denied Abbott's recusal motion. The denial was memorialized in an Order entered January 21, 2009.

While the matter was pending, Abbott obtained a quitclaim deed from the Russells. By this conveyance, the Russells conveyed their interest in the railroad bed, if any.

Eventually, the matter proceeded to a bench trial. By Opinion and Judgment entered in February 2016, the trial court, relying on *Illinois Cent. R.R Co. v. Roberts*, 928 S.W.2d 822 (Ky. App. 1996), adjudged Guirguis the owner of the property. The trial court's basic rationale was that the railroad merely held an easement for the right-of-way, and upon abandonment of the easement, the adjoining property owners, on either side of the railroad, became fee simple owners to the center of the railroad. Abbott appealed, and the Court of Appeals affirmed. We granted Abbott's motion for discretionary review.

## II.     STANDARD OF REVIEW

As recently as August 2020, this court reaffirmed the rule that an appellate court reviews a denial of a motion for recusal for an abuse of discretion. *Thomas v. Commonwealth,* 605 S.W.3d 545, 559 (Ky. 2020); *Dunlap v. Commonwealth,* 435 S.W.3d 537, 587 (Ky. 2013).  The oft-quoted test for abuse of discretion is "whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).  In *Thomas,* we further reaffirmed "[t]he burden of proof required for recusal of a trial judge is an onerous one.  There must be a showing of facts 'of a character calculated seriously to impair the judge's impartiality and sway his judgment.'" 605 S.W.3d at 559 (quoting *Dunlap,* 435 S.W.3d at 590).  A party is required to show "more than 'a . . .  mere belief that the judge will not afford a fair and impartial trial[.]'" *Minks v. Commonwealth*, 427 S.W.3d 802, 808 (Ky. 2014) (quoting *Webb v. Commonwealth,* 904 S.W.2d 226, 230 (Ky. 1995) (citing *Howerton v. Price,* 449 S.W.2d 746, 748 (Ky. 1970)).

Our analysis of the history of judicial recusal in this Commonwealth, as well as parties' arguments in this case, disclose that our appellate decisions have inconsistently set forth the standard of review and failed to appropriately recognize evolving standards set forth by the legislature and this Court within the Code of Judicial Conduct.  SCR[7] 4.300.

---

[7] Supreme Court Rules.

Prior to its 1976 repeal, KRS[8] 23.230 provided the only guidance for judicial recusal. The statute addressed the appointment of a special judge and included among its causes "if either party files with the clerk of the court his affidavit that the judge will not afford him a fair and impartial trial." KRS 23.230(1).[9] Case law interpreting this section "require a statement of facts which not only show bias, prejudice or personal hostility toward the accused, but that such is of a character calculated seriously to impair the judge's impartiality and sway his judgment." *Foster v. Commonwealth*, 348 S.W.2d 759, 760 (Ky. 1961); *see also Howerton*, 449 S.W.2d at 748 (stating "[a] party's mere belief that the judge will not afford a fair and impartial trial is not sufficient. The asserted belief must be predicated on stated facts . . ."); *German Ins. Co. v. Landram*, 88 Ky. 433, 440, 11 S.W. 367, 369 (1889). In *Johnson v. Ducobu*, 258 S.W.2d 509, 510 (Ky. 1953), and while our predecessor court reaffirmed the requirement of a factually-based affidavit, it also noted that it had "been careful to protect litigants from every possibility of bias on the part of trial courts. To that end, we have held that all facts stated in an affidavit must be considered as true for the purpose of a motion to vacate the bench." The rule that the facts contained in a litigant's affidavit were to be considered

---

[8] Kentucky Revised Statutes.

[9] As with, it seems, many statutes, this provision has a long pedigree. *See* Gen. Stats. ch. 28, art. 7, § 1 (Ky. 1879) (providing for election of special judge if the circuit judge "cannot properly preside in an action, . . . or either party shall file . . . his affidavit that the judge will not afford him a fair and impartial trial[]"). Following the ratification of the 1891 Constitution, with the re-codification of the statutes, this section became Ky. Stat. § 968. In 1926, Ky. Stat. § 968 was repealed and reenacted as Ky. Stat. § 971-6.

as true was adhered to even if the judge considered the allegation false or filed a countervailing affidavit to the contrary. *Conley v. Stivers*, 445 S.W.2d 439, 440 (Ky. 1969).

Just four years later, in *Wells v. Walter*, 501 S.W.259 (Ky. 1973), the court recognized,

> The judge is not the only one concerned in the just and correct course of justice. Nor, indeed, are the litigants the only ones to be consulted. The public generally have the right to feel that there is no favoritism in the courthouse; that there all men stand equal before the law, and that there justice will be dispensed to all with an even hand. The fact that the judge may be unconscious of any bias, and may be sure that interest or relationship could not dispose him to favor one side or the other, is not enough. The unsuccessful litigant has also the right to know that the decision was the offspring of a fair and impartial mind, and this satisfying assurance he cannot have if there are before his eyes facts or circumstances reasonably sufficient to create the belief that influences outside of the record operated in making the decision.

*Id.* at 260 (quoting from *Petrey v. Holliday*, 178 Ky. 410, 423, 199 S.W. 67, 72 (1917)). While the court recognized a judge's obligation to decide, it also noted as a higher consideration a litigant's entitlement "'to nothing less that the cold neutrality of an impartial judge . . . who is wholly free, disinterested, impartial and independent. Any doubt of qualification, therefore, should be resolved in favor of a party questioning it, bona fide, and upon grounds having substance and significance.'" 501 S.W.2d at 260 (quoting *Dotson v. Burchett*, 301 Ky. 28, 190 S.W.2d 697, 700 (1945)). The *Wells* court then reiterated the "universally recognized tradition of the law that the appearance of impartiality is next in importance only to the fact itself. It cannot be sacrificed to convenience." *Id.* at 260.

8

These pre-1976 cases are important because they established the framework for judicial recusal. 1) that recusal must be factually based; 2) a mere belief that a judge will not be fair and impartial is insufficient; 3) a trial judge's own belief as to his or her ability to preside is immaterial; and 4) a trial judge's recusal ruling is subject to appellate review.

In 1976, the legislature repealed KRS 23.230 and replaced it with KRS 26A.015 and 26A.020. KRS 26A.015, then and now, provides:

> (2)     Any justice or judge of the Court of Justice or master commissioner **shall** disqualify himself in any proceeding:
>
>         (a)     Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceedings, or has expressed an opinion concerning the merits of the proceeding;
>
>         . . .
>
>         (e)     **Where he has knowledge of any other circumstances in which his impartiality might reasonably be questioned.**

(emphasis added). The affidavit requirement "that the judge will not afford him a fair and impartial trial" was set forth in KRS 26A.020(1).[10] In that same year,

___

[10] In 1995, we held KRS 26A.020(1) to be an unconstitutional encroachment by the legislature on the judiciary's rule-making power. However, and despite this infirmity, we upheld the statute on comity principles. *Foster v. Overstreet*, 905 S.W.2d 504, 506-07 (Ky. 1995). Previous versions of KRS 26A.020(1), *supra* note 9, had been upheld under the constitutional provisions that authorized the legislature to provide for the naming of special judges. *German Ins. Co.*, 88 Ky. at 433, 11 S.W. at 368 (interpreting Ky. Const. of 1850, art. IV, § 28 (authorizing the legislature to "provide by law for holding circuit courts, when, from any cause, the judge shall fail to attend, or, if in attendance, cannot properly preside[]")). The present state constitution originally contained an identical provision as the 1850 constitution, Ky. Const. § 136, but this section was repealed with the adoption of the Judicial Article in 1976. *See* Ky. Const. § 110(5)(b) (directing the Chief Justice, as executive head of the Court of Justice, to "assign temporarily any justice or judge of the Commonwealth, active or retired, to sit

9

1976, the Supreme Court adopted SCR 4.000 to 4.300. SCR 4.300 contained the Code of Judicial Conduct.[11] The 1976 version of Canon 3C, although in many respects similar to KRS 26A.015(2), expressed the rule of disqualification as "[a] judge **should** disqualify himself in a proceeding in which his impartiality might reasonably be questioned[.]" (emphasis added). Subsequent revision of SCR 4.300, however, resulted in its disqualification rule largely mimicking KRS 26A.015(2)(e), in that "[a] judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where: (a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts[.]" SCR 4.300 (1999), Canon 3E(1). The commentary to this section states that "[u]nder this rule, a judge is disqualified whenever the judge's impartiality might reasonably be questioned, regardless whether any of the specific rules in Section 3E(1) apply." *Id.*, Commentary.[12]

---

in any court other than the Supreme Court when he deems such assignment necessary for the prompt disposition of cases[]").

[11] SCR 4.300 (1976) was based on the 1970 American Bar Association ("ABA") Model Code of Judicial Conduct. Effective January 1, 1999, we revised SCR 4.300 based on the ABA's 1990 American Bar Association's Model Code of Judicial Conduct. In February 2017, the Kentucky Supreme Court began the process of adopting a Code of Judicial Conduct based on the 2007 ABA Model Code. This process was completed in January 2018. Ky. S. Ct. Admin. Order 2018-04.

[12] Importantly, the Preamble to Code of Judicial Conduct provides guidance as to interpretation of these rules and commentary:

> The Code of Judicial Conduct is intended to establish standards for ethical conduct of judges. It consists of broad statements called Canons, specific rules set forth in Sections under each Canon, a Terminology Section, An Application Section and Commentary. The text of the Canons and the Sections, including the Terminology and Application Sections, is authoritative. The Commentary, by explanation and example, provides guidance with respect to the purpose and

Both the legislature and this Court have thus expressed policy that mandates recusal in any proceeding in which a judge's impartiality might reasonably be questioned.

Some of our opinions have recognized that the "inquiry under Canon 3E(1) 'is an objective one, made from the perspective of a reasonable observer who is informed of all the surrounding facts and circumstances.'" *Dean v. Bondurant*, 193 S.W.3d 744, 746 (Ky. 2006) (quoting *Microsoft Corp. v. United States*, 530 U.S. 1301, 1302 (2000)); *see also Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 850 (1988) (interpreting 28 U.S.C § 455(a) which mandates judicial disqualification "in any proceeding in which . . . impartiality might reasonably be questioned" to be evaluated from the standpoint of "a reasonable person, knowing the relevant facts"). As demonstrated in both *Dean* and *Presbyterian Church (U.S.A.) v. Edwards*, 594 S.W.3d 199 (Ky. 2018), the analysis can be factually intensive.

In *Stopher v. Commonwealth*, 57 S.W.3d 787, 794 (Ky. 2001), the defendant moved for recusal of the trial judge and for appointment of a non-Jefferson County judge, based on the close relationship between the local

---

meaning of the Canons and Sections. The Commentary is not intended as a statement of additional rules. When the text uses "shall" or "shall not," it is intended to impose binding obligations the violation of which can result in disciplinary action. When "should" or "should not" is used, the text is intended as hortatory and as a statement of what is or is not appropriate conduct but not as a binding rule under which a judge may be disciplined. When "may" is used, it denotes permissible discretion or, depending on the context, it refers to action that is not covered by specific proscriptions.

SCR 4.300 (1999) Preamble.

11

sheriff's department and judiciary. This Court, citing both KRS 26A.015(2) and SCR 4.300, Canon 3C(1) recusal provisions for "personal bias or prejudice" or "other circumstances in which . . . impartiality might reasonably be questioned" stated that "[t]he burden of proof required for recusal of a trial judge is an onerous one. There must be a showing of facts 'of a character calculated seriously to impair the judge's impartiality and sway his judgment.'" *Id.* (citing *Foster* and *Ducobu*).

Our decision in *Stopher* and a slightly earlier Court of Appeals opinion, *Brand v. Commonwealth*, 939 S.W.2d 358, 359 (Ky. App. 1997), appear to be the first instances of describing as "onerous" the recusal burden of proof.[13] In fact, in *Brand*, the court seems to have equated the onerous burden of proof with a showing "that the trial judge is prejudiced to a degree that she cannot be impartial." 939 S.W.2d at 359. The onerous burden of proof statement continues to be set forth in our more recent opinions. *E.g., Thomas*, 605 S.W.3d at 559; *Dunlap*, 435 S.W.3d at 590. The problem with this refrain is NOT that these cases were wrongly decided on their facts, but that they fail to recognize that the standard for measuring whether a judge's impartiality might reasonably be questioned is an "objective one, made from the perspective of a reasonable observer who is informed of all the surrounding facts and circumstances." *Edwards*, 594 S.W.3d at 201; *Dean*, 193 S.W.3d at 746.

---

[13] "Onerous" is an adjective typically referring to a task or responsibility and is defined as "[t]roublesome or oppressive; burdensome[.]" The American Heritage Dictionary of the English Language (1975).

12

Admittedly, both *Edwards* and *Dean* involved motions to recuse Supreme Court justices, but neither KRS 26A.015 nor SCR 4.300 differentiate between justices or judges based on level of court. *See also Sommers v. Commonwealth*, 843 S.W.2d 879, 881–82 (Ky. 1992) (citing both KRS 26A.015(2)(e) and SCR 4.300, Canon 3(C)(1) and stating that "[v]iewed in totality, the circumstances of the instant case persuade us that Judge Graves' impartiality might reasonably be questioned, and moreover that Judge Graves had knowledge of these circumstances[]").

Against that background, our standard of review for a recusal motion requires revision. Admittedly as recently as four months ago, we stated that a court's denial of a motion for recusal is reviewed for abuse of discretion. *Thomas*, 605 S.W.3d at 559; *Dunlap*, 435 S.W.3d at 587; *see Sommers*, 843 S.W.2d at 880 (stating as "[t]he first issue raised on appeal is whether the trial judge abused his discretion in denying the defendant's motion of recusation[]").[14] To the extent this standard implies appellate deferral to the trial judge and his or her reasoning in not recusing, it is inappropriate. Any judge who is faced with a recusal motion based on either partiality or bias, may naturally be loath to acknowledge same. In fact, the other side of the obligation to recuse when required is the judicial obligation to hear and decide cases when no real reason to recuse exists. *See* SCR 4.300 (1999), Canon

---

[14] The *Sommers* opinion appears to be the first one in which the Court undertook to review a judge's order on motion to recuse under an abuse of discretion standard. As previously discussed, this is inconsistent with the pre-1976 jurisprudence.

3B(1) (stating "[a] judge shall hear and decide matters assigned to the judge except those in which disqualification is required[]").[15]  Because an objective standard is appropriate for measuring whether a judge's impartiality might reasonably be questioned from the perspective of a reasonable observer who is informed of all the surrounding facts and circumstances, we hold, appropriately, that this determination is to be reviewed on appeal on a *de novo* basis.[16]

Going forward, when a party moves for a judge's recusal, an affidavit setting forth factual allegations is required.  If the judge grants the motion and recuses, a substitute judge is appointed to the case and the matter is at an end.  Conversely, if the motion is denied, the judge may include in the record

---

[15] The current rule on *Responsibility to Decide* is SCR 4.300, Rule 2.7.

[16] As a practical matter, this revised standard of review simply requires our appellate courts to review the matter with "a fresh set of eyes," without deference to the trial court's decision.  As noted, *supra*, many of our recent decisions concerning a motion to recuse would have been decided similarly whether we called our standard of review "abuse of discretion" or *de novo*.  For example, in *Thomas*, the claim of judicial bias arose on remand of a criminal case for resentencing and was based on certain statements made by the trial court in the prior proceeding.  605 S.W.3d at 559.  We agreed with the Commonwealth that adverse rulings in prior proceedings are insufficient to mandate recusal.  *Id.*; *see also Minks*, 427 S.W.3d at 806 (holding that a trial judge was not required to recuse from a suppression hearing regarding evidence seized because of search warrant signed by the same judge); *Dunlap*, 435 S.W.3d at 590 (upholding denial of recusal motion in criminal case when trial judge had previously presided over custody hearing concerning the defendant's victims).  Certainly, in some circumstances a judge's prior statements or rulings may cross the line and demonstrate that his or her impartiality might reasonably be questioned.  *E.g., Sommers*, 843 S.W.2d at 881-82.  In the ordinary course of judicial business, however, every reasonable person recognizes that cases may be remanded and return to the trial court, or new disputes arise, or a matter may return to the appellate courts for any number of reasons.  Mandatory recusal of judges or justices merely because of prior adjudication or familiarity with the parties would create an unworkable system.  In fact, our system of family courts, one judge, one family, explicitly contemplates that a judge will be familiar with a family based on previous matters.

whatever countervailing facts or considerations he or she deems pertinent to permit appellate review.

## III. ANALYSIS

### A. Recusal.

At the time Abbott moved for Judge Brantley's recusal, SCR 4.300, Canon 3E,[17] governing disqualification, provided:

(1) A judge shall disqualify himself or herself in **a proceeding in which the judge's impartiality might reasonably be questioned**, including but not limited to instances where:

(a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(emphasis added). The commentary under this section stated that "[d]islike of a party or a party's lawyer does not, by itself, constitute a personal bias or prejudice." We also noted that the obligation to recuse may exist whether any of the specific circumstances delineated by Canon 3E(1)(a)-(e) are met.

In this instance, we hold that Abbott has presented sufficient evidence of animosity between Judge Brantley and Donan to create a reasonable question of the judge's impartiality. While Judge Brantley characterized the incident and subsequent discourse between Donan and himself as "a disagreement over duck-hunting territory," we believe the correspondence proffered to the Judge by Abbott demonstrated something more heated. The 2004 correspondence between Donan, Brantley and the third individual demonstrated three

---

[17] In 2018, this Court revised SCR 4.300, based on the 2007 American Bar Association's Model Code of Judicial Conduct. The disqualification rules are now contained in SCR 4.300, Canon 2, Rule 2.11.

15

individuals who took their hunting rights and territory very seriously. Brantley's 2004 letter to Donan concluded with the statement, "I really do not wish to harbor bad feelings over a duck. But we do have permission to hunt on property which adjoins yours and, if we decide to do so, will be there." Additionally, the exchange did not end in 2004, but continued until at least a year later when Judge Brantley felt sufficiently bothered by Donan's apparent continuing statements within the community to engage counsel Deatherage to send a letter to Donan demanding certain corrective action. While counsel Deatherage did not explicitly threaten a lawsuit, his correspondence certainly implied one. Since Judge Brantley ran for election the following year, 2006, and would have been required to file for election by the end of January 2006, a reasonable assumption is that Brantley believed his election prospects might be adversely affected by Donan's statements and therefore Brantley had Deatherage send the letter. Rumors to the effect that a judicial candidate was encouraging lawlessness, *i.e.,* trespassing on land, might not go unnoticed by the electorate. Additionally, and while we note that the property at issue in this case is not the same property involved in the duck-hunting incident, it is in the same general area of Hopkins County. Abbott's stated interest in the proceeding is limiting access to its property, much as it had sought to limit Judge Brantley's access just a few years prior. We hold that Abbott sufficiently established that in this proceeding, Judge Brantley's impartiality might

16

reasonably be questioned and his recusal was mandatory under the SCR 4.300, Canon 3E(1).[18]

By this opinion, we do not impugn Judge Brantley's integrity. To paraphrase *Sommers*, 843 S.W.2d at 882, "the issue is not whether Judge [Brantley] was in fact impartial. On the true issue, *i.e.*, whether his impartiality *might reasonably be questioned*, we hold that under the circumstances it was indeed reasonable for [Abbott] to question Judge [Brantley's] impartiality[.]"

Because Judge Brantley erred in not recusing, the Hopkins Circuit Court judgment as well as the Court of Appeals opinion affirming must be vacated.

### B. *Property Ownership upon a Railroad's Abandonment of its Right-of-Way.*

Judge Brantley's failure to recuse requires us to vacate his Opinion and Judgment since new factual findings may be necessary on remand. That noted, interpretation of deeds and the devolution and ownership of a right of way following a railroad's abandonment are matters of law. The parties have briefed and argued these issues. Thus, as a matter of judicial economy, we give guidance on these issues.

As a matter of law, and in the absence of evidence to the contrary, a presumption exists that a railroad acquired a right-of-way easement—and not a fee—to construct its roadbed. *Roberts*, 928 S.W.2d at 825. In *Roberts*, the

---

[18] While the focus of this analysis is Judge Brantley's failure to recuse in a case in which his impartiality might reasonably be questioned as reviewed *de novo*, our decision would be the same if we reviewed under an abuse of discretion standard.

court based that presumption on what it described as a "a settled bias in favor of a railroad's acquisition of an easement rather than a fee." *Id.*; *see also Sherman v. Petroleum Expl.*, 280 Ky. 105, 109, 132 S.W.2d 768, 771 (1939) (stating "an indefinite or ambiguous conveyance of land specifically for a railroad right of way is . . . subject to . . . a general knowledge that much railroad right of way is expressly or by operation of law limited to an easement, which has been usually found sufficient for the purposes desired[]"). The surveyors in this case apparently were unable to find any deed in favor of P&L or its predecessors. So, to the extent no contrary evidence exists or is produced on remand, then P&L's interest, as a matter of law, was an easement over the right of way. *Roberts*, 928 S.W.2d at 825.[19]

Abbott argues that *Winston v. Louisville & Nashville R.R. Co.*, 160 Ky. 185, 169 S.W. 597 (1914) supports its claim that P&L or its predecessor had a fee simple title by adverse possession. We disagree. The dispute in *Winston* involved a side track which the railroad had possessed and used for over 40 years for general railroad purposes, loading and unloading cars, meeting of trains, placing cars for shipment, and discharging freight to consignees. *Id.* at 186–87, 169 S.W. at 597. As noted by the Court of Appeals, in its opinion herein, this use differs from use as a right-of-way. *See also Ballard v. Louisville & Nashville R.R. Co.*, 9 Ky. L. Rptr. 523, 5 S.W. 484 (1887) (holding that a deed

---

[19] A question may exist as to whether the Commonwealth had issued a patent for the subservient estate. The absence of a grant from the Commonwealth would not necessarily indicate that P&L or a predecessor had acquired fee title to the tract in question by adverse possession.

18

to the railroad was intended to pass the fee, and not a right-of-way easement, based on the price paid, the irregular shape of the tract conveyed, and the uses for which conveyed).

Next, and as a matter of law, upon P&L's abandonment of the railroad, the easement was extinguished, and the land reverted to the grantor or any successor in title. *Rose v. Bryant*, 251 S.W.2d 860, 861 (Ky. 1952); *Mammoth Cave Nat'l Park Ass'n v. State Highway Comm'n*, 261 Ky. 769, 776, 88 S.W.2d 931, 935 (1935). This case law dictates that P&L's conveyance or quitclaim deed to Abbott after its abandonment of the line was a nullity. Furthermore, in this case, the record appears to indicate that no grantor may exist. Assuming that, on remand, no grantor of the easement exists or can be determined, or if subsequent deeds describe the railroad as a boundary, our case law supports that landowners adjoining the right-of-way are presumed to accede to title to the land which was subject to the easement to the centerline. *Matthews v. Hudson*, 308 Ky. 39, 42, 213 S.W.2d 424, 425 (1948); *Henry v. Bd. of Trs.*, 207 Ky. 846, 847–48, 270 S.W. 476, 477 (1925); *Roberts*, 928 S.W.2d at 826–27.

On remand, the trial court will be required to determine the location of the tracts conveyed by the Russells to West and Speaks and then to Guirguis, whether those tracts adjoined or were bisected by the railroad right-of-way, and whether the Russells retained any interest in the land formerly subject to the right-of-way which was subject to the quitclaim deed to Abbott. Those factual determinations will determine the outcome of this controversy.

19

# IV. CONCLUSION

For the reasons set forth herein, the Court of Appeals' Opinion and Hopkins Circuit Court's Opinion and Judgment are vacated. This matter is remanded to the Hopkins Circuit Court for further proceedings consistent herewith.

Minton, C.J.; Conley, Hughes, Keller, Nickell and VanMeter, JJ., sitting. Minton, C.J.; Hughes, Keller, Nickell and VanMeter, JJ., concur. Conley, J., concurs in result only. Lambert, J., not sitting.

COUNSEL FOR APPELLANT:

Sheryl Glenn Snyder
Frost Brown Todd LLC

Thomas E. Springer
Springer Law Firm, PLLC

COUNSEL FOR APPELLEE, SAMUEL GUIRGUIS:

William Deatherage
Mark Alexander Gilbert
Deatherage Myers & Lackey, PLLC

COUNSEL FOR APPELLEES, DIANA P. HERRIN;
HOMESTEAD AUCTION & REALTY, INC. AND
DARRIN G. TABOR:

Todd Andrew Farmer
Farmer & Wright, PLLC

COUNSEL FOR APPELLEES,
PATSY E. HOLLAND; MICHAEL
RUSSELL AND SHARON RUSSELL:

Pro se

COUNSEL FOR APPELLEES, JAMES C.
SPEAKS AND DWIGHT E. WEST:

Richard E. Peyton
Frymire, Evans, Peyton, Teague & Cartwright

COUNSEL FOR APPELLEE, THE ESTATE OF JOHNNY
BROWN RUSSELL, BY AND THROUGH ITS
EXECUTOR, WARREN K. HOPKINS:

Pro se